## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| REGIS INSURANCE COMPANY, | : | |
| | : | C.A. No. 10-3171 |
| *Plaintiff,* | : | |
| vs. | : | |
| | : | **JURY TRIAL DEMANDED** |
| A.M. BEST COMPANY, INC., | : | |
| | : | |
| *Defendant.* | : | |

## <u>ORDER</u>

AND NOW, this            day of                    , 2012, upon consideration

of the Motion for Summary Judgment of Defendant A.M. Best Company, Inc. (Doc. 46) and any

Opposition and/or Reply, and after hearing oral argument, it is hereby ORDERED that the

motion is DENIED.


BY THE COURT:


_____

HON. PETRESE B. TUCKER, U.S.D.J.

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

REGIS INSURANCE COMPANY,  :
                             :        C.A. No. 10-3171

        *Plaintiff,*        :

    vs.                   :

                             :    **JURY TRIAL DEMANDED**

A.M. BEST COMPANY, INC.,    :

                             :    **ORAL ARGUMENT REQUESTED**

        *Defendant.*      :

**PLAINTIFF REGIS INSURANCE COMPANY'S MEMORANDUM OF LAW
IN OPPOSITION TO THE MOTION FOR SUMMARY JUDGMENT OF
<u>A.M. BEST COMPANY, INC. (Doc. 46)</u>**

**HAINES & ASSOCIATES**
CLIFFORD E. HAINES (PA 09882)
DANIELLE M. WEISS (PA 201067)
Haines & Associates
1835 Market Street
Suite 2420
Philadelphia, PA 19103
(215) 246-2200 (phone)
(215) 246-2211 (fax)
*Attorneys for Plaintiff Regis Ins. Co.*

June 7, 2012

## TABLE OF CONTENTS

TABLE OF CITATIONS.................................................................................iii

I.  COUNTERSTATEMENT OF FACTS........................................................1

    A.  Background on the Parties...........................................................1

        1.  Regis Insurance Company............................................1

        2.  A.M. Best ....................................................................1

    B.  Regis' Rating History Was Positive Until 2010.........................3

    C.  A.M. Best Downgraded Regis in 2010........................................4

        1.  For the First Time Since Regis Had Been Rated By Best, Best Requested Tiber's Financial Statement In Connection with Regis' 2010 Annual Rating Analysis.........................................................4

        2.  A.M. Best Accuses Mr. Di Loreto of Misrepresenting Tiber's Financial Condition for Years.......................................................5

        3.  A.M. Best Looks to the Pennsylvania Insurance Department for More Information, But Then Disregards It..........................................6

        4.  The Peer Rating Committee Met to Rate Regis on December 14, 2009, and Altonji Alone Voted to Maintain Regis' 2009 Rating........................7

        5.  Regis Appealed the Rating Decision.............................................8

        6.  Regis Tirelessly Attempted to Convince A.M. Best to Reconsider the B-Rating..............................................................9

    D.  Regis Has Lost Substantial Business As a Result of the Downgrade...............9

    E.  Regis Attempts to Mitigate Loss......................................................10

II.  ARGUMENT.............................................................................10

    A.  Standard of Review..................................................................10

    B.  Regis' Defamation and Commercial Disparagement Claims Withstand Scrutiny and Must Be Tried..........................................................11

        1.  Regis States a Valid Cause of Action for Defamation......................11

      a.    A.M. Best's statements are capable of defamatory meaning because the "opinions" disclose false and defamatory facts that can be disproved……………………………………………………………...12

      b.    A.M. Best published the statements about Regis with actual malice……………………………………………………………………16

    2.    Regis States a Valid Claim for Commercial Disparagement……………20

C.    Regis States Valid Claims of Tortious Interference with Contractual Relations and Prospective Contractual Relations………………………………………………21

III.    CONCLUSION………………………………………………………………………22

## TABLE OF CITATIONS

**Page(s)**

CASES

*Agriss v. Roadway Express, Inc.,*
    483 A.2d 456 (Pa. Super. 1984)......................................................................13

*Anderson v. Liberty Lobby, Inc.,*
    477 U.S. 242, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).......................................11

*Bakare, v. Pinnacle Health Hosp., Inc.,*
    469 F. Supp. 2d 272 (M.D. Pa. 2006).............................................................12

*Bouriez v. Carnegie Mellon Univ.,*
    585 F.3d 765 (3d Cir. 2009)..........................................................................11

*Bro-Tech Corp. v. Thermax, Inc.,*
    651 F.Supp.2d 378 (E.D.Pa. 2009).............................................................20, 21

*Compuware Corp. v. Moody's Investor's Services, Inc.,*
    499 F.3d 520 (6th Cir. 2007)........................................................................13

*Doe v. Luzerne County,*
    660 F.3d 169 (3d Cir. 2011).........................................................................11

*Fanelle v. LoJack Corp.,*
    79 F. Supp. 2d 558 (E.D. Pa. 2000)..............................................................12

*Genesee County Emples. Ret. Sys. v. Thornburg Mortg. Secs. Trust 2006-3,*
    825 F. Supp. 2d 1082 (D.N.M. 2011)............................................................13

*Harte-Hanks Communications, Inc. v. Connaughton,*
    491 U.S. 657 (1989)...............................................................................17, 18

*Jefferson Co. Sch. Dist. v. Moody's Investor's Servs., Inc.,*
    175 F.3d 848 (10th Cir. 1999)......................................................................13

*Kaucher v. County of Bucks,*
    455 F.3d 418 (3d Cir. 2006).........................................................................10

*Marcone v. Penthouse Int'l Magazine for Men,*
    754 F.2d 1072 (3d Cir. 1985).......................................................................16

*Milkovich v. Lorain Journal Co.,*
    497 U.S. 1 (1990)...............................................................................12, 16

*Mzamane v. Winfrey,*
    693 F. Supp.2d 442 (E.D. Pa. 2010) .............................................................................12, 13

*New York Times v. Sullivan,*
    376 U.S. 254 (1964) ...................................................................................................16

*Pelagatti v. Cohen,*
    536 A.2d 1337 (Pa. Super. 1987) ..................................................................................21

*Rebozo v. Washington Post Co.,*
    637 F.2d 375 (5th Cir. 1981) ........................................................................................17

*Sharon v. Time, Inc.,*
    599 F.Supp. 538 (S.D.N.Y. 1984) .....................................................................17, 18, 19

*Smith v. Sch. Dist. of Phila.,*
    112 F. Supp. 2d 417 (E.D. Pa. 2000) ............................................................................12

*St. Amant v. Thompson,*
    390 U.S. 727 (1968) ..............................................................................................16, 17

**STATUTES**

42 Pa. C.S. § 8343(a) (Purdon's 2010) ...............................................................................12

**OTHER AUTHORITIES**

Fed. R. Civ. P. 56(a) .........................................................................................................10

First Amendment .......................................................................................................11, 14

Notes of Dec. 11 ...............................................................................................................6

Restatement (Second) of Torts § 566A ...............................................................................13

## I.     COUNTERSTATEMENT OF FACTS

### A.     Background on the Parties.

#### 1.     Regis Insurance Company

Regis Insurance Company, Inc. ("Regis") is a property and casualty insurance company operating out of offices in Wayne, Pennsylvania.  See January 12, 2010 Press Release, attached as Ex. A.  Regis is owned by a holding company, Tiber Holding Corporation ("Tiber").  See, e.g., Deposition of Earl Helstrom, attached as Ex. B at 30:8-33:7.  Tiber's lone asset of value is Regis.  Ex. B at 30:8-33:7.  Tiber is dormant and its only function is to hold Regis and a few other shell corporations that are no longer operating companies.  Ex. B at 33:5-7.

Regis underwrites commercial policies of insurance.  Deposition of Richard A. Di Loreto, attached as Ex. C, at 29:12-17.  It has operated in a niche market for over 30 years.  See, e.g., Best Insurance Reports for Regis 2000-2009, attached as Ex. D.  Regis is operated by Richard A. Di Loreto,[1] who is the 90 year-old President of the company and has been at its helm for the vast majority of its existence.  Ex. C at 6:3-22.  There was a brief period of time in 2009-early 2010 in which someone other than Mr. Di Loreto served as the President of the company. Ex. C at 6:3-22; see also, Deposition of Gerard Altonji, attached as Ex. E at 19:6-20:17; Deposition of Marc Liebowitz, attached as Ex. F at 93:11-15.  Mr. Di Loreto is once again the President of Regis.  Ex. C at 6:3-22.  Regis has been rated by A.M. Best Company, Inc. ("A.M. Best" or "Best") every year since the mid-1980's.  Ex. C at 78:8-13.

#### 2.     A.M. Best

---

[1]       Best devotes pages of its memorandum in support of its motion to a description of Mr. Di Loreto's personal legal battles and to litigation having to do with other businesses owned and/or operated by the Di Loreto family.  None of this litigation involves Regis and is, therefore, utterly irrelevant to the instant matter.  Arguably, these details are included merely to paint an ugly portrait of Mr. Di Loreto in order to avoid the ordinary sympathy anyone would have toward an elderly man whose life's work has been ruined by the careless stroke of a pen.  The details are also meant to cast doubt upon Mr. Di Loreto's credibility, but issues of credibility cannot be determined at the summary judgment stage.

In business since 1899, Best holds itself out on its website as "the leading information provider for the global insurance industry." Further, Best describes itself as a "company devoted to issuing in-depth reports and financial strength ratings" and offering "the largest coverage of insurers and reinsurers in the United States, Canada, the United Kingdom and worldwide of any interactive rating organization." Indeed, it is considered the bellwether of insurance company analysis. Agents, brokers, businesses and individuals look to an insurance company's A.M. Best rating as the definitive statement on the financial health of a particular insurance company. Representatives of A.M. Best have conceded in this litigation that they are aware that an insurance company's viability in the marketplace will rise or fall on its Best rating. Ex. E at 37:29-43:16; Deposition of Matthew Mosher, Ex. G, at 38:20-42:6.

A.M. Best's rating process involves one annual meeting with the entity to be rated and a review of materials such as balance sheets, financial statements, filings with the company's regulating authority and any other written material requested by A.M. Best at the meeting. A.M. Best analysts take the information provided and apply various published (and some proprietary) formulae and methodologies to the information in order to develop a rating for the entity. The rating will include a financial strength rating, a credit issuer rating and a predictive outlook for the coming year. See, Ex. H, Preface from 2010 Best's Insurance Reports. After a preliminary analysis has been completed by the analytical team, it is presented to a Peer Review Committee comprised of senior A.M. Best executives and the analytic team. A vote is taken as to the appropriate rating to be given to the insurance company based on the analysis. E.g., Deposition of Anthony Diodato, attached as Ex. I, at 11:8-13:16, 14:12-25:25.

A.M. Best analyzes an insurance company's financial strength ("FSR") and its ability to meet its ongoing obligations to its insureds. Ex. H. This rating is based upon a review of a

2

company's balance sheet, operating performance and business profile. Ex. H. In connection with this rating, Best engages in both a "top-down" and "bottom-up" analysis to assess sources of risk to a rated entity. Ex. E at 46:9-47:18; Ex. F at 65:22-72:25; 175:11-178:19. This analysis includes consideration of risk as a result of activity at the parent company. Ex. E at 46:9-47:18; Ex. F at 65:22-72:25; 175:11-178:19. This would include an assessment of whether the parent company can place a call on the capital of the insurance company subsidiary/affiliate. Best strives to analyze only reasonable risk to the rated company. Ex. F at 41:5-54:5, 228:5-245:17. Far-fetched risk is not supposed to be part of the analysis. Ex. F at 41:5-54:5, 228:5-245:17.

One component of the rating is the assignment of a Best's Capital Adequacy Ratio ("BCAR score"). See, Understanding Universal BCAR (Mar.19, 2007), Ex. J; Understanding BCAR for Property/Casualty Insurers (Sept. 2, 2009), Ex. K. The BCAR score involves a quantitative review of an insurance company's risk-adjusted capitalization. The higher a company's BCAR score, the more financially healthy the company is considered to be by A.M. Best's standards. Ex. K.

Using Best's published methodology for Understanding BCAR in 2009, Regis' score would have been A++ in January 2010. Ex. K. In fact, Regis' BCAR score has been in the A++ range consistently since 2004. Ex. J. A++ is the highest possible BCAR score. Ex. J; Ex. K.

**B.     Regis' Rating History Was Positive Until 2010.**

It is undisputed that over the decades in which Regis has been rated by Best, Regis' has enjoyed positive ratings. From 2000-2009, Regis was never given an FSR of less than a B. Ex.D. In 8 out of 10 of those years, Regis was rated B+ (Good). Regis was consistently rated at that level from 2005-2009. Ex. D. However, Regis was downgraded to B- in January, 2010. Ex. A. This rating assignment was the culmination of Best's annual review of Regis, which began in November, 2009.

**C.      A.M. Best Downgraded Regis in 2010.**

      **1.      For the First Time Since Regis Had Been Rated By Best, Best Requested Tiber's Financial Statement In Connection with Regis' 2010 Annual Rating Analysis.**

Regis' 2010 rating analysis began with a meeting on November 12, 2009 at Best's offices with Regis' then-president, Jim Moll and comptroller, Sharon Rinaldo.  Ex. L, Deposition of Sharon Rinaldo, at 4:13-18; Ex. F at 92:3-98:20.  This meeting was the first (and only) meeting with Best in Regis' history that Mr. Di Loreto did not attend.  Ex. M, Best's Notes of Meetings with Regis.  During that meeting, a request was made for Regis to produce a financial statement for its parent company, Tiber.  Ex. F at 101:5-105:6.  According to Mr. Di Loreto's deposition testimony, this was the first time Best had a financial statement for Tiber.  Ex. C at 84:24-86:1.  Best has been aware of the relationship between Regis and Tiber since at least 2000 (as noted in Best' Insurance Report on Regis of that year).  Ex. D.

Following the meeting, Marc Liebowitz, the Best ratings analyst following Regis, reiterated the request for a copy of Tiber's audited financial statement.  Liebowitz email, attached as Ex. N.  Best acknowledges this is the first written request ever made by them for Tiber's audited financial statement in the over twenty year history of rating Regis.  Ex. F at 128:18-129:9.  A copy of Tiber's audited financial statement was immediately provided to Best.  Tiber's financial statement, attached as Ex. O.  Because of a clerical error at Best, the financial statement did not reach the property and casualty analytic team until approximately December 3, 2009, although it had been date stamped as received by the life/health rating division on November 16.  Ex. F at 114:16-120:17; Ex. O.

Tiber's audited 2008 financial statement reflects that Tiber is insolvent. Ex. O. According to the footnotes in the statement, there are two judgments against Tiber. One of the judgments was entered by consent and has grown in value to over $40 million including interest. This judgment was entered against Tiber in 2001 arising out of a lawsuit involving a now defunct insurance company in New York, once operated by Di Loreto. The judgment is held by the New York Department of Insurance Liquidation Bureau ("judgment holder" or "Liquidator"). Tiber was that company's parent as well. Ex. O. Thus, Tiber has been (technically) insolvent since that time. The judgment is and always has been a matter of public record.

Regis has always disclosed to Best, and to any insurance authority to which it was required to report, that Tiber is its parent, and A. M. Best has acknowledged this fact in each of its Best's Insurance Reports. Ex. D. Further, Regis' annual statement, which is filed each year with insurance departments in every state in which it does business, reflects that Regis' tax return is filed as a consolidated return with its parent, Tiber. See, Regis' Annual Statement for 2009, attached as Ex. P; Ex. C, at 5:10-24. A copy of this statement is provided to A.M. Best each year in connection with the rating analysis. Ex. L, 5:10-24.

### 2.   A.M. Best Accuses Mr. Di Loreto of Misrepresenting Tiber's Financial Condition for Years.

On December 4, 2009, one day following receipt of Tiber's audited financial statement, Gerard Altonji and Marc Liebowitz (A. M. Best's supervisory analyst and primary analyst, respectively, responsible for conducting the ratings analysis of Regis) called Mr. Di Loreto. Ex. C at 92:23-96:21; Ex. F at 128:18-130:22; Ex. E at 20:5-22:16. They were upset by what they learned from the financial statement about Tiber's financial condition. Ex. C at 92:23-96:21; Ex. F at 128:18-130:22; Ex. E at 20:5-22:16. In the call, they accused Mr. Di Loreto of being a liar. Ex. C at 92:23-96:21; Ex. F at 128:18-130:22; Ex. E at 20:5-22:16. Mr. Di Loreto steadfastly

denied having deceived Best.  Ex. C at 92:23-96:21.  Indeed, there is no proof in Best's file that

such information about Tiber had ever been requested.  In this conference call, as well as in

others that took place throughout December 2009, Mr. Di Loreto took the position that he had

not misrepresented Tiber's condition and that Tiber's financial condition had no impact at all on

Regis.  Ex. Q, Mr. Di Loreto's notes of December 4, 2009 conversation; Ex. R, Notes from Best

files of the December 4, 2009 conversation.  There were several teleconferences between Mr. Di

Loreto and the Best analytic team between December 4, 2009 and December 14, 2009.  Ex. S;

Ex. Q. Notes from Mr. Di Loreto's conversations; Ex. T, Notes from A.M. Best's file of the

December Conversations.

> ### 3.    A.M. Best Looks to the Pennsylvania Insurance Department for More Information, But Then Disregards It.

Unlike an ordinary business that may be seized to satisfy the debts of its parent company,

an insurance company cannot be touched without permission of the regulating authority.  See,

generally, Ex. U, Deposition of Stephen Johnson.  Mr. Di Loreto informed Mr. Altonji and Mr.

Liebowitz that Stephen Johnson, Deputy Insurance Commissioner of the Pennsylvania Insurance

Department would confirm that Pennsylvania would not allow the Liquidator to seize Regis to

satisfy Tiber's debts.  Ex. E at 89:8-108:11; Ex. F at 132:3-142:12, 173:6-176:4, 195:7-216:3;

Ex. V, Deposition of Andrew Colannino, at 33:16-52:3, 79:11-80:16.  Accordingly, Mr. Di

Loreto urged Mr. Altonji and Mr. Liebowitz to speak to Mr. Johnson.  Their notes indicate that

they, along with their superiors, spoke with Mr. Johnson on December 11, 2009.  Ex. W, Notes

of Dec. 11 conversation. Mr. Johnson confirmed that Regis could not be seized by the New York

Liquidation Bureau in order to satisfy Tiber's debt.[2]  Ex. W; Ex. U.  A second conversation

---

[2]    Mr. Johnson disclosed in this conversation that the New York Liquidation Bureau had effectively blocked a potential sale of Regis when it refused to take the proceeds of the sale in exchange for satisfaction of the

between Best and Mr. Johnson took place on January 5, 2010.  Ex. X, Notes of January 5

conversation; Ex. I  at 26:17-27:3, 35:17-37:18, 38:10-19.  Mr. Johnson also dismissed concerns

that Regis could be seized in this conversation.  Ex. I at 38:10-19.

Mr. Johnson provided the Best team with information about the Tiber judgment and the

regulator's perspective on the impact of that judgment on Regis.[3] Ex. E at 89:8-108:11; Ex. F at

132:3-142:12, 173:6-176:4, 195:7-216:3;  Ex. V at 33:16-52:3, 79:11-80:16; Ex. U.   From the

Pennsylvania Insurance Department's position, Regis was a financially viable company, was not

in need of special supervision and there was no concern about Tiber's debt.  Ex. U.  Notably, it is

undisputed that A.M. Best did not contact the judgment holder for information.

### 4. The Peer Rating Committee Met to Rate Regis on December 14, 2009, and Altonji Alone Voted to Maintain Regis' 2009 Rating.

The A.M. Best Peer Rating Committee ("PRC") met to review Regis on December 14,

2009 and voted to downgrade Regis from B+ to C+ (4 rating levels lower, a rating downgrade of

extraordinary magnitude).  Ex. I at 27:4-34:16; Record of December 14, 2009 Committee Vote,

Ex. Y.  Although they were displeased with the dire picture of Tiber's financial condition, an

internal A.M. Best memorandum suggests that even in the face of Tiber's audited financial

statement results, Altonji and Liebowitz believed that Regis was still financially sound and

should receive a financial strength rating of B+ for the year 2010 with a stable outlook, and made

this recommendation to A. M. Best's Property and Casualty Peer Rating Committee (PRC).  Ex.

Z. Notes of PRC Meeting; Ex. Y.  The PRC disagreed.  Ex. Z.

---

total debt.  Understandably, the potential buyer refused to purchase Regis if it could not do so without this
encumbrance.

[3]      On p. 7 of its brief, A.M. Best cites to deposition testimony from Mr. Johnson taken more than a
year after this December 11, 2009 conference call in which Best's lawyers asked Mr. Johnson whether in his opinion
Regis would be able to raise capital.  Mr. Johnson is not qualified to give an opinion as to that issue.  Neither is his
opinion on that issue relevant to this lawsuit or what Best learned from Mr. Johnson contemporaneous with its rating
decision.

Because the rating was so drastically downgraded, the PRC requested that the rating be reviewed by the Corporate Ratings Committee ("CRC"), which ratified the C+ rating assignment on December 16, 2009.  Ex. I at 27:4-34:16; Ex. AA, CRC Vote; Ex. G at 102:2-109:4.  A president's letter was issued to Regis reflecting the rating decision.  Ex. BB, December President's Letter.

### 5.    Regis Appealed the Rating Decision.

When Mr. Di Loreto was made aware that Regis was to be downgraded so substantially, he initiated an appeal of the C+ rating.  In support of the appeal, he hired Linda Kaiser Conley, Esquire of Cozen O'Connor (the Philadelphia law firm) and a former Commissioner of the Pennsylvania Department of Insurance, to write an opinion letter to Best stating why Regis could not be seized to satisfy Tiber's debts and as such was not impacted by Tiber's theoretical financial inflexibility.  Ex. CC, Letter from Conley dated 12/20/09.  Ms. Conley wrote a letter to Mr. Altonji dated December 20, 2009 explaining Regis' position.  Ex. CC.  Mr. Di Loreto also enlisted assistance from Regis' longtime outside accountant, Earl W. Helstrom.  Ex. B 115:14-116:5; Ex. DD, Correspondence from Helstrom to Best.  There was a substantial exchange of correspondence that subsequently went back and forth between Mr. Di Loreto, Ms. Conley, Mr. Earl Helstrom and representatives from A. M. Best. Ex. DD.

On January 6, 2010, a more senior ratings committee reviewed Regis' appeal and changed the rating from C+ to B-.  Ex. EE, Jan. 6, 2010 Vote.  Notwithstanding Regis' legitimate requests to raise the rating from B- to B+, supported by Regis' demonstrably strong capitalization and very high BCAR score, Best published its new rating for Regis, which was B-. Ex. A.  Because this was a downgrade, according to Best policy, a press release was issued announcing the decreased rating.  Ex. A.  The press release stated that "A.M. Best Co. has downgraded the financial strength rating to B- (Fair) from B+ (Good) and issuer credit rating to

'b-' from 'bbb-' of Regis Insurance Company (Regis) (Wayne, PA)." Ex. A. The press release goes on to state "the outlook for both ratings has been revised to negative from stable."  The press release further indicated that "the downgrade was meant to reflect a recent disclosure of lack of financial flexibility at Regis' privately held parent, Tiber Holding Corporation (Tiber) (Wilmington, DE).  The downgrade was also meant to reflect "Regis' poor operating performance." Ex. A.

> **6.     Regis Tirelessly Attempted to Convince A.M. Best to Reconsider the B- Rating.**

Following the publication of the rating, Mr. Di Loreto continued to seek what he felt were justified changes in the rating report.  At Mr. Di Loreto's request, Stephen Johnson wrote a letter to A. M. Best representatives memorializing his stated position during their telephone conversations.  Ex. FF, Johnson's 1/25/10 letter.   Best's failure to accept Mr. Johnson's reassurance is a clear departure from its stated methodology, which unequivocally states that Best defers in all circumstances to a company's regulating authority.  Ex. GG, Expert Report of Michael A. Cohen.  As a representative of the Pennsylvania Insurance Department, Stephen Johnson speaks for Regis' regulating authority.  Ex. U at 14:4-9.  Mr. Di Loreto also wrote directly to Arthur Snyder, President of A.M. Best and Andrew Colannino, another Best senior executive.  Ex. HH, Letter to Arthur Snyder; Ex. V at 70:19-74:22.  A.M. Best was unconvinced.

> **D.     Regis Has Lost Substantial Business As a Result of the Downgrade.**

Regis continues to accrue underwriting loss as a result of the downgrade.  Since January 2010, many of Regis' policyholders have stopped renewing their policies.  Certain brokers who used to direct clients to Regis policies no longer continue to do business with Regis.  Ex. II, Compilation of Regis Policy Non-Renewals.  Some have stated that it is because of Regis' B-rating.  Ex. II; see also, Ex. C at 128:8-133:16.

### E.     Regis Attempts to Mitigate Loss.

Notwithstanding these losses, Regis continues to operate.  To meet its underwriting

requirements, it has lowered its standards for applications and now insures greater risks than it

would have in other times.  Regis also filed this lawsuit in attempts to recover the money it has

lost and in attempt to restore its rating to B+.

## II.     ARGUMENT

Regis' complaint states five claims against A.M. Best: Defamation (Count I);

Commercial Disparagement (Count II); Tortious Interference with Contractual Relations (Count

III); Tortious Interference with Prospective Contractual Relations (Count IV); and a Declaratory

Judgment Action (Count V).  A.M. Best argues in its motion for summary judgment that each of

the Regis' claims fail as a matter of law.[4] However, A.M. Best ignores myriad fact issues which,

if proved at trial, would entitle Regis to relief.  Therefore, the motion for summary judgment

must be denied.

### A.     Standard of Review

Summary judgment is appropriate only where "the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.

R. Civ. P. 56(a) (revised 2011).  A "genuine dispute" exists only "if there is a sufficient

evidentiary basis on which a reasonable jury could find for the non-moving party."  *Kaucher v.*

*County of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006) (citing *Anderson v. Liberty Lobby, Inc.*, 477

U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986))).  Moreover, "a factual dispute is

---

[4]     Regis does not intend to pursue its claim for a declaratory judgment.

'material' only if it might affect the outcome of the suit under governing law." *Doe v. Luzerne County*, 660 F.3d 169, 175 (3d Cir. 2011) (citing *Gray v. York Newspapers, Inc.*, 957 F.2d 1070, 1078 (3d. Cir. 1992)).  At the summary judgment stage, the "Court's task is not to resolve disputed issues of fact, but to determine whether there exist any factual issues to be tried." *Anderson*, 477 U.S. at 247-49).

When deciding a motion for summary judgment, "the Court must view the evidence, making all reasonable inferences from the evidence in the light most favorable to the non-moving party." *Bouriez v. Carnegie Mellon Univ.*, 585 F.3d 765, 770 (3d Cir. 2009)).  If there is a factual issue that cannot be resolved without a credibility determination, the "Court must credit the non-moving party's evidence over that presented by the moving party." *Anderson*, 477 U.S. at 255).

**B.    Regis' Defamation and Commercial Disparagement Claims Withstand Scrutiny and Must Be Tried.**

A.M. Best contends that Regis' claims for defamation and commercial disparagement must fail because the Best Rating is (i) merely a statement of Best's opinion; (ii) not published with actual malice; and (iii) protected by the First Amendment.  Even assuming a Best rating is a statement of opinion, Regis states a valid claim for defamation and commercial disparagement because Best's rating is (i) not a pure opinion, (ii) is predicated on false and defamatory facts; and (ii) is thus not protected by the First Amendment.  Summary judgment must be denied.

**1.    Regis States a Valid Cause of Action for Defamation.**

To set forth a claim for defamation in Pennsylvania, Regis must establish: "(i) the communication was defamatory; (ii) it was published by the defendant; (iii) the communication applies to the plaintiff; (iv) the recipient of the communication understands the communication's defamatory meaning; (v) the recipient understands the communication to be intended to apply to

the plaintiff; (vi) special harm resulting to the plaintiff from its publication; and (vii) abuse of a conditionally privileged occasion." 42 Pa. C.S. § 8343(a) (Purdon's 2010); see also *Fanelle v. LoJack Corp.,* 79 F. Supp. 2d 558, 561-62 (E.D. Pa. 2000). The plaintiff need not prove special harm for statements that constitute defamation per se. Defamation per se includes publications that "impute to another conduct, characteristics, or a condition that would adversely affect his or her lawful business trade." *Bakare, v. Pinnacle Health Hosp., Inc.,* 469 F. Supp. 2d 272, 298 (M.D. Pa. 2006)(citations omitted).[5]

> a. **A.M. Best's statements are capable of defamatory meaning because the "opinions" disclose false and defamatory facts that can be disproved.**

A.M. Best claims that Regis' defamation claim fails as a matter of law because the statements made about Regis constitute an opinion, which is not actionable. However, absolute protection applies only to pure opinion speech. *Milkovich v. Lorain Journal Co*., 497 U.S. 1, 18 (1990). Here, as Best must concede, its own methodologies state that its ratings are based both upon objective and subjective criteria. To the extent that the ratings of a company are based on quantitative analysis, such analysis is capable of proof. When opinion speech discloses untrue statements of fact, it is no longer absolutely protected. See, e.g., *Mzamane v. Winfrey,* 693 F. Supp.2d 442, 481-83 (E.D. Pa. 2010).

Only statements of fact can afford a basis for a defamation action. *Smith v. Sch. Dist. of Phila.,* 112 F. Supp. 2d 417, 429 (E.D. Pa. 2000). Statements of opinion that disclose fact are not actionable only when the opinion-holder discloses the entire factual predicate for the opinion. Court have found that when all the facts are disclosed an opinion cannot be defamatory because

---

[5] Assuming that the Court finds the Best Rating describing Regis is capable of defamatory meaning, which will be argued more fully below, the defendant has no choice but to admit that elements ii, iii, iv, and v of a defamation claim are met here. Regis will therefore not address these elements.

the listener is able to evaluate the facts for himself and is free to disregard the conclusion made from the facts.  *See* Restatement (Second) of Torts § 566A; see also *Mzamane,* 693 F. Supp. 2d at 481.  But when an opinion that discloses only some of the facts on which it's based is defamatory, it is actionable.  *Id.*  In making a determination whether the statement is capable of defamatory meaning, the Court must consider the nature of the audience.  See, e.g., *Agriss v. Roadway Express, Inc.,* 483 A.2d 456 (Pa. Super. 1984)(finding that the audience for the defamatory statement made it clear that plaintiff would be subject to contempt and ridicule).  The ultimate question is whether the alleged defamatory statement will have a tendency to lower the plaintiff's esteem in the community. It is for the Court to determine as a matter of law whether the statements are capable of defamatory meaning.  *Mzamane,* 693 F. Supp.2d at 481 (citations omitted).

In support of its "opinion speech" argument, Best cites a Sixth Circuit case, *Compuware Corp. v. Moody's Investor's Services, Inc.,* 499 F.3d 520, 529 (6th Cir. 2007), and  a Tenth Circuit Case, *Jefferson Co. Sch. Dist. v. Moody's Investor's Servs., Inc.,*  175 F.3d 848, 852, 855-56 (10th Cir. 1999).  Neither case is instructive here--at least not to determine whether the statements are capable of a defamatory meaning.  Each of these cases addresses whether the rating agency defendant acted with actual malice when publishing statements about the plaintiff.[6]  Indeed, in *Jefferson County School District*, the Tenth Circuit affirmed the trial court's decision to dismiss the complaint because the plaintiff failed to articulate a false statement in the Moody's rating, but nonetheless specifically found that a Moody's rating could be capable of a defamatory meaning.  *Id.* at 855.  Thus, ratings agencies are not per se immune on opinion grounds from liability for statements made about a rated entity.  *Id.;* see also *Genesee County Emples. Ret. Sys.*

---

[6] Actual malice will be addressed below in Section III.B.b.

*v. Thornburg Mortg. Secs. Trust 2006-3*, 825 F. Supp. 2d 1082 (D.N.M. 2011)(denying motion to dismiss, finding that alleged defamatory statements made by ratings agency defendants, though opinions, could be capable of defamatory meaning and are not necessarily protected by the First Amendment).

A.M. Best argues that its "opinion" is further protected because it fully disclosed the underlying basis for it. The facts show otherwise. A.M. Best issued a press release announcing Regis' downgrade without disclosing any facts in support of its stated reasons for doing so. See, Ex. A. The press release stated that Regis was downgraded because of "the *recent* disclosure of the lack of financial flexibility at Regis' privately held parent, **Tiber Holding Corporation** (Wilmington, DE), due to that organization's high consolidated financial leverage, *lack of access to additional capital* and *other operating issues*. Additionally, these ratings actions consider *Regis' continued poor operating performance*." (emphasis supplied). This press release, aimed at the entire insurance industry, is A.M. Best's warning that Regis is not financially strong and would not be a safe company in which to place insurance. Ex. G at 37:15-40:18. The press release is not even two pages long. Ex. A. It provides no underlying analysis. Indeed, the statements themselves standing alone are patently untrue and can be easily disproved.

First, the press release implies that there was a *recent* issue at the parent company. The press release does not provide the relevant information that the "recent disclosure" was of a 2001 judgment that in almost ten years, made absolutely no impact on Regis. The press release says nothing of the judgment holder's numerous attempts to seize Mr. Di Loreto's assets—which also has no impact at all on Regis--but that in those years of collection efforts, which are yet ongoing,[7] not once has the judgment holder made any effort to seize Regis. Regis is entitled to

---

[7] The defendants exhaustively describe these efforts in their memorandum at p. 8 and at p. 11.

14

the benefit of the inference that this firestorm of litigation against Mr. and Mrs. Di Loreto and the absence of collection efforts against Regis in now over ten years suggests that Regis cannot be seized.

The press release also suggests that Tiber would be unable to access additional capital without disclosing that Tiber's only business is to hold Regis' stock and is otherwise dormant. There would be no reason for Tiber to require "access to additional capital." This is not a legitimate or reasonable concern under the circumstances.

The press release also suggests that Regis was suffering from "*continued* poor operating performance," which it was not. In fact, in each year from 2000-2009, Regis was described as outlook stable. Indeed in 2004, a year in which Regis was downgraded, A.M. Best reported that "Despite these negative factors, A.M. Best views the rating outlook as stable given that Regis' low underwriting leverage and much improved underwriting results in recent years." See, Ex. D. In February 2009, just 8 months before the 2010 rating review took place, A.M. Best wrote of Regis, "The rating outlook reflects the company's very strong capitalization."

Thus, the press release gives the reader a false impression that Regis is not financially strong, and that something "recent" had happened at the parent company that might have a negative effect on Regis. This is in sharp contrast to the February 2009 rating report and, even more tellingly, to Regis' 2010 BCAR score, which A.M. Best admits was very high.

Both Regis and Best have produced expert reports that analyze the statements made about Regis and examine whether under the disclosed methodologies, a reader of the press release or the Best's Insurance Reports entry for Regis would be able to disabuse itself of the "opinions" stated by Best. Regis' expert, Michael A. Cohen concludes that Best substantially deviated from a number of its methodologies such that it could not have properly disclosed the basis for

downgrading Regis in 2010.  Ex. GG.  By contrast, Best's expert, Hope Maxwell, opines that

A.M. Best did not deviate from its stated methodology when downgrading Regis and therefore

provided a complete analysis sufficient for a reader of the opinion to make his own independent

judgment based upon the full disclosure of facts.  Ex. JJ, Maxwell Report.  Assuming the Court

finds that Best's statements are capable of a defamatory meaning, a jury will have to determine

as a matter of fact whether Best materially departed from its published methodologies.  Thus the

motion for summary judgment must be denied.

There is no question that the falsity of the statements made in the press release is capable

of proof.  Under *Milkovich*, even if Best's Press Release is considered a statement of Best's

opinion, the opinion is not protected.  The Court must find as a matter of law that the statements

are capable of a defamatory meaning.

> **b.    A.M. Best published the statements about Regis with actual malice.**

A.M. Best argues that Regis' claims also fail as a matter of law because Regis cannot

demonstrate that Best published the statements with actual malice.  In the context of a

defamation claim, actual malice means knowledge that a published statement is false or that the

speaker acted with reckless disregard for the truth or falsity of the statement it published.  *New

York Times v. Sullivan*, 376 U.S. 254, 280 (1964); see also *Marcone v. Penthouse Int'l Magazine

for Men*, 754 F.2d 1072, 1089 (3d Cir. 1985).   Reckless conduct "is not measured by whether a

reasonably prudent man would have published, or would have investigated before publishing."

*St. Amant v. Thompson*, 390 U.S. 727, 731 (1968).  Rather, to demonstrate reckless disregard for

the truth or falsity of a defamatory statement, the plaintiff must show "sufficient evidence to

permit the conclusion that the defendant in fact entertained serious doubts as to the truth of its

publication."  *Id*.  This is a subjective inquiry that may be based on circumstantial evidence that

16

demonstrates sufficient evidence to show that the defendant had a high degree of awareness of probable falsity. *Harte-Hanks Communications, Inc. v. Connaughton*, 491 U.S. 657, 668 (1989)(citations omitted).

It is rare in a defamation case to find direct evidence of a defendant's "serious doubts" as to the truth of a published defamatory statement. *St. Amant v. Thompson,* 390 U.S. at 732. Although failure to fully investigate alone is insufficient to carry this burden, a failure to pursue the most obvious available sources for corroboration of the truth of a published statement may be sufficient. *Id.*

For example, the Fifth Circuit found that there was a genuine issue of material fact as to whether the defendants acted with actual malice where the plaintiff, a close friend of President Nixon, established that the defendant reporter interviewed him but failed to inquire about the "key question." *Rebozo v. Washington Post Co.,* 637 F.2d 375, 382 (5th Cir. 1981). In that case, the reporter avoided asking Mr. Rebozo about deposition testimony that created an ambiguity with other information already gathered. Instead, the reporter stated facts in the most damaging possible way to Mr. Rebozo. The Fifth Circuit determined that a jury could conclude that the reporter avoided asking the key question so as to avoid learning the truth. *Id.*

Similarly, in *Sharon v. Time, Inc.,* the court determined on review of Time's motion for summary judgment that there was a genuine issue of material fact as to whether Time acted with actual malice because the reporter conducted an interview with a source but did not ask about the key issue. *Sharon v. Time, Inc.,* 599 F.Supp. 538, 584-85 (S.D.N.Y. 1984). The *Sharon* opinion is exhaustive and carefully evaluates, for purposes of demonstrating actual malice, the critical

difference between not interviewing a source at all and interviewing a source, but failing to ask the source about the key issue.[8]  *Id.*

The U.S. Supreme Court has also taken up this question of whether actual malice can be demonstrated by failure to interview a witness about the key question and determined that failure to investigate in and of itself is not proof of actual malice. *Harte-Hanks,* 491 U.S. at 693.   But, the Court found that purposeful avoidance of the truth may constitute actual malice.  *Id.*

Here, there is ample evidence from which a jury could infer that A.M. Best had serious doubts about the truth of its published statements about Regis and evidence that A.M. Best purposefully avoided investigation of the key issue from the most obvious source of information. First, when the ratings committee voted on December 14, 2009 to downgrade Regis from B+ to a C+, Best convened a meeting of its Corporate Ratings Committee to verify the decision to downgrade Regis so severely.  The severity of the decision to downgrade at this level is also made clear by the undisputed fact that Mr. Altonji voted to maintain Regis' prior rating of B+, even in light of the new facts learned about the judgment against Tiber.  Ex. Y.  From this, a jury could infer that there were "serious doubts" about the statements made about Regis.

Next, it is undisputed that the Corporate Rating Committee met on December 16, 2009 and that it voted to ratify the December 14 result.  Yet, the published rating for Regis was not C+, it was B-, perhaps because Regis initiated an appeal procedure.  Without any explanation, A.M. Best raised the rating slightly following the appeal, even though the appeal committee had the same "evidence" before it as did the CRC on December 16, 2009.   Best could not have been entirely sure of its findings if it could make the change so readily on January 6, 2010.

---

[8]      Ultimately, the jury returned a verdict in favor of Time in this very famous case.  Nonetheless, the trial opinion on this issue is instructive and persuasive in this case.

Putting aside the appeal process, there is further evidence of reckless disregard.  The fact that Regis' BCAR Score is so strong suggests that on an objective level, A.M. Best must concede that by its own formula, Regis is adequately capitalized and demonstrates very strong potential to meet its obligations to policyholders.  Ex. J; Ex. K.  From an empirical standpoint, Regis is strong.  To state that its outlook is unstable is patently false by A.M. Best's own standards.  A jury could easily conclude that A.M. Best intentionally ignored evidence of Regis' strength for any number of reasons, including spite.

Additionally, A.M. Best failed to investigate its concerns by choosing not to consult the most obvious source of the information to address its concern—the judgment holder.  If Best were truly interested in determining whether the judgments against Tiber had any real impact on Regis, it could have easily contacted the judgment holder to determine whether it planned to seize Regis.  But Best did not.  Purposeful avoidance is an adequate ground on which to find actual malice.  See, e.g., *Sharon,* 599 F. Supp. at 584-85.

The analysts also ignored the age of the judgment relative to the judgment holder's collection efforts.  While the lapse of time may not entirely eliminate the possibility that Regis could be seized, it casts serious doubt on whether that malady would come to pass.  Indeed the flurry of litigation cited in the defendant's brief at pp. 8 and 11 strongly suggests that the judgment holder has no intention of pursuing Regis if it hasn't done so already.

A.M. Best has acknowledged that its qualitative assessment of negative factors when conducting the ratings analysis must be reasonable.  There is a genuine issue of material fact as to whether it was reasonable to conclude the judgment could or would have any impact on Regis.  In light of the record evidence, a jury could find that fear the Regis would be seized is irrational under the circumstances.

19

A.M. Best also bases its "opinion" on the equally irrational fear that should all of Regis'
policyholders submit claims on the same day, Regis would be in a capital crisis without recourse
to raise funds.  While it may be true that traditional lending sources might not be available to
Regis given the financial condition of its parent, this does not mean that alternative funding
sources, such as venture capital or private equity, would be unavailable.  Best argues that Regis'
expert agreed with Best that financing would not be available, but he merely agreed that a bank
would probably not lend to Regis.  Alternative funding sources cannot be ignored.  In this
economy, traditional sources of funding are unavailable even to some of the most well-
established businesses.  If ability to get a loan from a bank were required for a positive A.M.
Best rating, an inordinate number of companies would have to be downgraded.  It is doubtful that
Best methods would be universally applied in a way that would cause such a negative impact on
economic growth and recovery.

There are myriad issues of material fact as to whether Best acted with actual malice.
Taking the facts in the light most favorable to Regis, a jury could conclude that the statements
about Regis were published with actual malice.  Therefore, summary judgment must be denied.

### 2.    Regis States a Valid Claim for Commercial Disparagement

To set forth a claim for commercial disparagement in Pennsylvania, Regis must establish
"that the defendant published as statement about plaintiff's business to another, and: (i) the
statement was false; (ii) the publisher either intended the publication to cause a pecuniary loss or
reasonably should have recognized that publication would result in pecuniary loss; (iii) pecuniary
loss did in fact result; and (iv) the publisher either knew the statement was false or acted in
reckless disregard of its truth or falsity." *Bro-Tech Corp. v. Thermax, Inc.,* 651 F.Supp.2d 378,
416 (E.D.Pa. 2009).  Damages should be set forth with specificity, but this requirement is
"relaxed where the disparagement claimed rises to the level of defamation per se, through

20

publication which imputes to another conduct, characteristics, or a condition that would adversely affect [plaintiff] in [its] lawful business." *Id.*

A.M. Best argues that for all the reasons why Regis' claim for defamation fails, its claim for commercial disparagement must also fail. Regis has demonstrated genuine issues of material fact to be resolved by a jury as to its defamation claim. For the same reasons, the defendant is not entitled to summary judgment as to the commercial disparagement claim and the motion must be denied on this ground as well.

### C.     Regis States Valid Claims of Tortious Interference with Contractual Relations and Prospective Contractual Relations.

Under Pennsylvania law, to make out a claim for tortious interference with existing or prospective contractual relationships, Regis must establish: "(i) the existence of a contractual, or prospective contractual relation between the complainant and a third party; (ii) purposeful action on the part of the defendant, specifically intended to harm the existing relation, or to prevent a prospective relation from occurring; (iii) the absence of privilege or justification on the part of the defendant; and (iv) the occasioning of actual legal damage as a result of the defendant's conduct." *Pelagatti v. Cohen,* 536 A.2d 1337, 1343 (Pa. Super. 1987)(citations omitted).

A.M. Best argues that Regis cannot establish that it intended harm to Regis' contractual relationships. The record evidence supports an inference that A.M. Best was motivated to harm Regis because it was embarrassed not to have learned of the judgment against Tiber for almost ten years, when with reasonable diligence it would have. Mr. Di Loreto's notes of the December 4, 2009 conversation indicate that Mr. Altonji and Mr. Liebowitz accused him of being a liar, which they concede. A reasonable jury could find that the analysts were motivated by anger and/or embarrassment. Coupled with Best's acknowledgement of the value of its ratings in the marketplaces, it is reasonable to conclude that Best intended to punish Mr. Di Loreto and Regis

by driving Regis out of business.  Regis has suffered the loss of many long-standing accounts since it was downgraded.  A reasonable jury might find that this business loss is a direct result of Best's intentional acts.

Regis' claims for interference with existing and prospective contractual relations are adequately supported by record evidence.  Therefore, the motion for summary judgment must be denied.

**III.    CONCLUSION**

For all the reasons stated in this memorandum of law in opposition to defendant A.M. Best's motion for summary judgment, the motion should be denied and this matter should be scheduled for trial.  Furthermore, Regis Insurance Company hereby requests oral argument.

Respectfully submitted:
**HAINES & ASSOCIATES**


____/s/ Clifford E. Haines_____
CLIFFORD E. HAINES (PA 09882)
DANIELLE M. WEISS (PA 201067)
1835 Market Street
Suite 2420
Philadelphia, PA 19103
(t) (215) 246-2200
(f) (215) 246-2211
*Attorneys for Regis Insurance Company*

Date: June 7, 2012

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

REGIS INSURANCE COMPANY,             :
                                     :        C.A. No.: 10-3171
          *Plaintiff,*               :
     vs.                             :
                                     :        **JURY TRIAL DEMANDED**
A.M. BEST COMPANY, INC.,             :
                                     :
          *Defendant.*               :

### CERTIFICATE OF SERVICE

I, Danielle M. Weiss, Esquire hereby certify that I have caused this document to be filed electronically on this day.  It is available for reviewing and downloading from the ECF System, and will be served electronically on all counsel.

Date:   June 7, 2012

/s/ Danielle M. Weiss
DANIELLE M. WEISS (PA 201067 )
Email: dweiss@haines-law.com
Haines & Associates
1835 Market Street - Suite 2420
Philadelphia, PA 19103
Telephone: 215-246-2200
Fax:   215-246-2211
*Attorney for Plaintiff Regis Ins. Co.*

## TABLE OF EXHIBITS TO PLAINTIFF'S OPPOSITION TO
## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

| Exhibit | Description | Bates Range |
|---------|-------------|-------------|
| A. | January 12, 2010 Press Release: A.M. Best Downgrades Rating of Regis Insurance Company | RIC000729 – 30 |
| B. | Deposition of Earl Helstrom | |
| C. | Deposition of Richard A. Di Loreto | |
| D. | Best Insurance Reports for 2000-2009 | AMB000114 – 45 |
| E. | Deposition of Gerard Altonji | |
| F. | Deposition of Marc Liebowtitz | |
| G. | Deposition of Matthew Mosher | |
| H. | Deposition of Anthony Diodato | |
| I. | Preface from 2010 Best's Insurance Reports | AMB002130 – 57 |
| J. | Understanding Universal BCAR (Mar. 19, 2007) | RIC000650 – 54 |
| K. | Understanding BCAR for Property/Casualty Insurers | RIC000070 – 93 |
| L. | Deposition of Sharon Rinaldo | |
| M. | A.M. Best Handwritten Notes from November 12, 1009 Meeting | AMB000404 – 57 |
| N. | December 3, 2009 Email String between Marc Liebowitz and Sharon Rinaldo | AMB000193 – 94 |
| O. | Tiber Holding Corporation and Subsidiaries Consolidated Financial Statements Years Ending December 31, 2008 and 2007 | AMB001057 – 76 |
| P. | Annual Statement of the Regis Insurance Company for year ended December 31, 2009 | RIC001934 – 2053 |
| Q. | Notes Concerning the A.M. Best Matter Involving Marc Liebowitz and Gerard Altonji since RAD's 1½ hour Conversation with them on December 4, 2009 | RIC001362 – 64 |

| Exhibit | Description | Bates Range |
|---------|-------------|-------------|
| R. | A.M. Best Handwritten Notes from December 4, 2009 Conversations | AMB000323 – 27 |
| S. | Notes Re: Converstaion between Gerard Altonji, Marc Liebowitz, Earl Heltstrom & RAD about the C+ on December 17, 2009 | RIC001393 – 94 |
| T. | A.M. Best Notes re: Review of Communications Following Receipt of the Holding Company Financials | AMB000320 - 22 |
| U. | Deposition of Stephen Johnson | |
| V. | Deposition of Andrew Colannino | |
| W. | A.M. Best Handwritten Notes from December 11, 2009 Conference Call with Stephen Johnson | AMB000328 – 32 |
| X. | A.M. Best Handwritten Notes from January 5, 2010 Conference Call with Stephen Johnson | AMB000328 – 32 |
| Y. | Notes of December 14, 2009 PRC Meeting | AMB000339 – 41 |
| Z. | December 14, 2009 PRC Vote | AMB000345 – 48 |
| AA. | December 16, 2009 CRC Vote | AMB000349 – 50 |
| BB. | December 2009 President's Letter | |
| CC. | December 20, 2009 Letter from Linda Kaiser Conley to Gerard Altonji and Marc Liebowitz | RIC000600 – 02 |
| DD. | Various Correspondence of Earl Helstrom to A.M. Best | AMB000052 – 57; 29-32; 199; 208 – 09 |
| EE. | January 6, 2010 Appeal Vote | AMB000334 – 35 |
| FF. | January 25, 2010 Letter from Stephen Johnson to Andrew Colannino and Gerard Altonji | RIC000603 – 04 |
| GG. | Expert Report of Michael A. Cohen | |
| HH. | January 7, 2010 Letter from Richard Di Loreto to Arthur Snyder | RIC000607 – 08 |
| II. | Packet of Non-renewal Emails | RIC001696 – 1747; 2111 - 48 |

| Exhibit | Description | Bates Range |
|---------|-------------|-------------|
| JJ. | Expert Report of Hope Maxwell | |