**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **REGIS INSURANCE COMPANY,** | : | |
| | : | |
| **Plaintiff,** | : | |
| v. | : | **CIVIL ACTION** |
| | : | |
| **A.M. BEST COMPANY, INC.,** | : | **NO. 10-3171** |
| | : | |
| **Defendant.** | : | |
| | : | |
| | : | |
| | : | |

## MEMORANDUM OPINION

**Tucker, J.**                                                          **February ___, 2013**

Presently before the Court are Defendant A.M. Best Company, Inc.'s Motion for

Summary Judgment (Doc. 46), Plaintiff Regis Insurance Company's Response in Opposition

thereto (Doc. 47), and Defendant's Reply (Doc. 49).  Upon consideration of the parties' motions

with briefs and exhibits, and for the reasons set forth below, Defendant's motion will be ***granted***

***in part and denied in part***.

## I.  FACTUAL BACKGROUND[1]

Regis Insurance Company ("Regis") is a property and casualty insurance company

operating out of offices in Wayne, Pennsylvania.  Regis is owned by a holding company, Tiber

Holding Corporation ("Tiber").  Tiber's lone asset of value is Regis.  Tiber is dormant and its

only function is to hold Regis and several other shell corporations that are no longer operating

companies.  Regis underwrites commercial policies of insurance, and has done so for over 30

---

[1] Unless noted otherwise, the following facts are undisputed.

1

years.  Regis is operated by Richard Di Loreto ("Mr. Di Loreto"),[2] who has served as Regis'
president for the vast majority of its existence.  Tiber is owned by Mr. Di Loreto's wife,
daughter, and the Di Loreto Foundation.

A.M. Best Company, Inc. ("A.M. Best" or "Best") is a credit rating agency that develops
and publishes financial strength ratings ("FSRs") and issuer credit ratings ("ICRs") of insurance
companies for use by the public, including the subscribers to its publications.[3]  Best determines
credit ratings based on its own methodologies (both published and proprietary).  Best has been in
business since 1899.

Generally speaking, Best's ratings process is as follows.  Best first gathers information
from public and non-public sources.  Meetings and communications between Best personnel and
management of the entity being rated provide additional information.  In this regard, Best
reviews materials such as balance sheets, financial statements, filings with the company's
regulating authority, and other written material requested by Best at the meeting.  Best's analysts
then take the information provided and apply various published and proprietary formulae and
methodologies to the information in order to develop a rating for the entity.  The rating will
include a FSR, ICR, and predictive outlook for the coming year.  After a preliminary analysis
has been completed by Best's analytical team, the analysis is presented to a Peer Ratings
Committee comprised of senior Best executives and the analytic team.  A vote is then taken on

---

[2] This opinion refers to Richard Di Loreto as "Mr. Di Loreto" rather than simply "Di Loreto" in order to distinguish
him from other members of his family, who are also involved with Regis, Tiber, and other related organizations.

[3] According to A.M. Best:

> The FSR is a figure specific to the insurer's ability to meet ongoing insurance policy and contractual
> obligations. The ICR is a figure as to the overall creditworthiness of an insurer from the perspective of its
> senior creditors. Since policyholders typically are among the senior-most creditors of an insurer, FSRs, in
> practice, have been the equivalent of the ICR for operating purposes.  A.M. Best uses a translation table to
> determine an FSR from ICR.

(Def.'s Mot. Summ. J. n. 13.)

the appropriate rating to be given to the entity based on the analysis. A.M. Best then

disseminates its' ratings, the bases for its ratings, and information concerning its methodologies

on its website and in its various publications.

In connection with formulating this rating, Best engages in both a "top-down" and

"bottom-up" analysis to assess sources of risk to the rated entity. Best's standard methodology

provides:

> The top-down analysis includes the exposure to risk generated by activities at the
> parent/holding company[,] such as the potential strain on the operating entity from debt-
> service requirements related to the parent's borrowings, as well as the benefits of
> earnings diversification that may come from being a member of a diversified
> organization. For the non-rated subsidiaries, A.M. Best performs a detailed internal
> analysis of their risk profile and resulting effect on the rated entities within the group,
> including A.M. Best's judgment as to the exposure of that entity to debt or other
> borrowings at the holding company level.
>
> The bottom-up analysis focuses on an assessment of the risks generated directly by the
> operations of the rated entity itself, as well as any other rated affiliates. For insurers, this
> analysis includes an assessment of underwriting, credit, interest rate, market and other
> risks at the operating company level. The primary objective of this overall approach is to
> gain a broad understanding of the potential impact on the current and future balance sheet
> of the rated operating entity – both from its own operations and those of its parent and
> affiliates….

(Def.'s Ex. O at 20-21, "Excerpt's from 2010 Best's Credit Rating Methodology.") (emphasis

added). Accordingly, Best's analysis of risk explicitly includes, inter alia, consideration of the

risk generated by the activities at the parent/holding company, such as the potential strain on the

subsidiary from the parent's borrowings and whether a parent's activities could reasonably be

expected to place a call on the capital of the subsidiary or limit the insurer's access to capital

from investors or lenders.

Regis has been rated by A.M. Best every year since the mid-1980s. Over the decades in

which Regis has been rated by Best, Regis has enjoyed positive ratings. In 1999, Regis was

rated A- (Excellent). In 2000, Regis was downgraded to B+ (Very Good). From 2000 to 2009,

Regis was never given an FSR of less than a B (Fair), which it was rated in 2004 and 2005. In eight out of ten of those years (2000, 2001, 2002, 2003, 2006, 2007, 2008, and 2009), Regis was rated B+ (Very Good) by Best. The case at bar concerns A.M. Best's rating of Regis in 2010, at which time Regis was downgraded to from a B+ to a B- (Fair). This rating was the culmination of Best's annual review of Regis, which started in November 2009 and ended in January 2010.

Regis' 2010 rating analysis began with a meeting on November 12, 2009 at Best's offices. In attendance for Best were Gerald Altonji ("Altonji'), the analysts' team leader, and Marc Liebowitz ("Liebowitz"), a ratings analyst. In attendance for Regis were Jim Moll, Regis' then-president, and Sharon Rinaldo, Regis' comptroller. During this meeting, the representatives from Best requested that Regis produce a financial statement for its parent company, Tiber. Following the meeting, Regis promptly provided a copy of Tiber's Consolidated Financial Statements for 2008 and 2007. The statement was received by Regis on November 16, 2009, although due to a clerical error at Best the statement did not reach the property and casualty analytic team until approximately December 3, 2009.

According to the financial statement, there are two judgments against Tiber. (Def.'s Ex. Z at Note P, "Tiber Holding Corporation and Subsidiaries Consolidated Financial Statements Years Ending December 31, 2008 and 2007.") Mr. Di Loreto formerly operated a now-defunct insurance company, Nassau Insurance Company ("Nassau") that was the subject of litigation in New York. Tiber was the parent company of Nassau as well. As a result of the litigation, the Superintendent of Insurance of the State of New York (the "NY Liquidator") obtained judgments against Tiber in August 2000 and May 2002. These judgments totaled almost $43 million as of December 31, 2008, including interest. Thus, Tiber's financial statement reflects, and Regis concedes, that Tiber is insolvent. In addition, Tiber's accountants cautioned that Tiber's

financial and legal circumstances "create an uncertainty about the Company's ability to continue as a going concern." (Id. at Note R.)

The November 12, 2009 meeting was apparently the first time, in the entire history between these two companies, that A.M. Best requested Tiber's financial statement from Regis. Indeed, there is no proof in Best's file on Regis that such information about Tiber had ever been requested. Best, however, claims that on prior occasions Best's employees had inquired about the financial condition of Tiber. Best contends that Regis' representatives, including Mr. Di Loreto and Rinaldo, had always told them that Tiber had "no debt" and that it was financially sound. It is Best's position that, until late 2009, it had always taken Regis at its word. Regis, conversely, argues that Best has always been aware that Tiber is Regis' parent company and that it has never misrepresented Tiber's financial condition to Best. Regis further argues that the judgments against Tiber are and have always been a matter of public record. Accordingly, Regis denies have ever deceived Best and asserts that Tiber's financial condition has no impact at all on Regis.

On December 4, 2009, one day following the receipt of Tiber's financial statement by the proper individuals at Regis, a conference call took place between Altonji, Liebowitz, Mr. Di Loreto, and Earl Helstrom (Regis' accountant). Best expressed concern regarding the judgments and Tiber's insolvency. But unlike an ordinary business that may be seized to satisfy the debts of its parent company, an insurance company cannot be seized without the permission of its regulating authority. Accordingly, Mr. Di Loreto informed Altonji and Liebowitz that Stephen Johnson, Deputy Commissioner of the Pennsylvania Department of Insurance ("PA DOI"), would "confirm" that Pennsylvania would not allow the NY Liquidator to seize Regis in order to satisfy Tiber's debts.

On December 11, 2009, at the request of Mr. Di Loreto, Altonji and Leibowitz called Johnson. Johnson informed Altonji and Leibowitz that, in his view, the NY Liquidator's judgments were "meaningless."[4] (Def.'s Ex. OO, "Marc Liebowitz's Handwritten Notes from January 1, 2009 Call with Stephen Johnson.") However, Johnson also informed Altonji and Leibowitz the NY Liquidator had effectively blocked the sale of Regis by refusing to release its judgments against Tiber in return for being paid the proceeds of a proposed sale ($10 million).

Best did not contact NY Liquidator directly, nor did Regis request that Best contact the NY Liquidator directly. However, public records indicate that the NY Liquidator has taken various steps to collect on its judgments. For instance, in April 2003, the NY Liquidator recorded the judgments in Pennsylvania and served writs of execution on Regis for those judgments. The NY Liquidator also forced the sale of the Di Loretos' home in 2009 and obtained a payment of $1.1 million dollars from the eventual sale. The NY Liquidator also collected over $2.65 million from a malpractice action brought against the Di Loretos. Most recently, the NY Liquidator filed a complaint in the Eastern District of Pennsylvania against the Di Loretos, among others, alleging a "scheme" to transfer title to the Di Loreto home to a shell

---

[4] It is unclear exactly what Johnson meant by his use of the word "meaningless." Regis interprets Johnson's position as a "confirmation" that Regis could not be seized by the NY Liquidator. (Pl.'s Res. Opp'n 6.) However, according to Leibowitz's notes, it does not appear that Johnson ever used language as strong as "confirm." Further, at his deposition, Johnson testified that at no time did he express an opinion in his conversations with A.M. Best as to whether he would permit the NY Liquidator to take control of Regis. (Def.'s Ex. F, "Deposition of Stephen Johnson.") However, Johnson *has* expressed doubt as to the practical implications of the judgments. Specifically, in a letter to A.M. Best following its final ratings decision on Regis, Johnson stated the following:

> I have had two prior conversations with representatives from A.M. Best concerning Tiber's financial condition and the existing judgment against it and conveyed the opinion of the Department that the financial condition and judgment did not raise any concerns with respect to Regis. As you are aware, Regis has adequate capital, reserves[,] and liquidity to meet its obligations to its policyholders irrespective of Tiber's financial condition. The Department has seen no evidence to suggest that Regis would not continue to have adequate capital, reserves[,] and liquidity even if Tiber's financial condition deteriorated to the point where it was necessary for Tiber to file bankruptcy. In fact, even in the event Tiber filed for bankruptcy protection, there is no regulatory requirement that the Department place Regis under supervision.

(Def.'s Ex. TT, "Letter from Stephen Johnson to Andrew Collannino and Gerald Altonji, dated January 25, 2010.)

corporation using previously concealed funds and asserting claims for reverse veil-piercing, fraudulent transfer, constructive fraudulent transfer, unjust enrichment, and civil conspiracy.[5] That matter is still pending.

Following the phone call with Johnson, the A.M. Best Peer Ratings Committee ("PRC") met on December 14, 2009 to review Regis. The analytic team of Altonji and Leibowitz recommended to the PRC that Regis' 2009 rating (a B+ rating with stable outlook) be affirmed. However, the PRC (with the exception of Altonji) voted to downgrade Regis from a B+ to a B- (Fair).

The PRC's decision was then referred to a second rating committee, the Corporate Rating Committee ("CRC") because of "extraordinary notching" resulting from Tiber's low rating.[6] (Def.'s Mot. Summ. J. 13.) The CRC has different members from the PRC (with one exception) and its members are more senior that the PRC's members. On December 16, 2009, the CRC voted to downgrade Regis' FSR even further, to C+ (Marginal). All CRC members, except for one, voted to lower Regis' rating with a negative outlook.

The following day, December 17, 2009, Liebowitz sent a draft press release to Mr. Di Loreto, which stated Regis was being downgraded to a C+. This instigated a flurry of

---

[5] Regis takes issue with Best interjecting Mr. Di Loreto's "personal legal battles" in its motion for summary judgment. Regis asserts that "[n]one of this litigation involves Regis and is, therefore, utterly irrelevant to the instant matter." (Pl.'s Res. Opp'n n. 1.) Notably, however, Regis does not dispute the truth or substance of Mr. Di Loreto's legal troubles. The Court does not believe that these separate legal matters are "irrelevant" to the case at bar. On the contrary, the NY Liquidator's collection efforts are highly relevant to the question of how great a risk Regis is in of being seized in order to satisfy Tiber's debts. This is especially true given that these various legal matters, as well as reports made by the PA DOI, evidence a concern that there is a commingling of assets between Regis and Tiber and the two organizations are not operated as separate and distinct companies.

[6] "Notching" in this context appears to mean "downgrading." As previously noted, A.M. Best considers the operating insurer as well as its parent and affiliated companies in rating the insurer. With this information, Best decides whether the insurer's rating should be enhanced or "dragged down" by the financial conditions of the related companies. A holding company is assigned its own ICR as an independent entity. In this instance, Regis' ICR was effectively being dragged down by financial conditions at Tiber. (See Def.'s Ex. O at 50, "Excerpt's from 2010 Best's Credit Rating Methodology.")

correspondence between Regis and Best, during which Mr. Di Loreto appealed the downgrade. As part of this process, a second conversation between Best representatives and Johnson took place on January 5, 2010. Johnson again dismissed concerns that Regis was at risk. In sum, the position of the PA DOI, as expressed by Johnson, was that Regis was "walled off" from Tiber's judgments and therefore remained financially viable. Based on this additional conversation with Johnson, the CRC voted to revise Regis' FSR from C+ to B-. Best sent a revised draft of the press release to Mr. Di Loreto. Mr. Di Loreto again protested, expressing his opinion that Regis should be treated as a stand-alone company and independent of Tiber. Best maintained its position that the financial condition of Tiber had an adverse impact on Regis. Regis issued its final press release, reflecting the B- rating, on January 12, 2010. Regis, in turn, issued its own counter-press release on February 22, 2010. This litigation ensued.

## II. <u>STANDARD OF REVIEW</u>

Summary judgment is appropriate where the moving party establishes that "there is no genuine issue as to any material fact and that [it] is entitled to a judgment as a matter of law." Fed R. Civ P. 56(c); <u>see</u> <u>also</u> <u>Levy v. Sterling Holding Co., LLC</u>, 544 F.3d 493, 501 (3d Cir. 2008). A factual dispute between the parties will not defeat a motion for summary judgment unless it is both genuine and material. <u>See</u> <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247-48 (1986); <u>Dee v. Borough of Dunmore</u>, 549 F.3d 225, 229 (3d Cir. 2008). A factual dispute is genuine if a reasonable jury could return a verdict for the non-movant, and it is material if, under the substantive law, it would affect the outcome of the suit. <u>See</u> <u>Anderson</u>, 477 U.S. at 248; <u>Fakete v. Aetna, Inc.</u>, 308 F.3d 335, 337 (3d Cir. 2002).

The moving party must show that if the evidentiary material of record were reduced to admissible evidence in court, it would be insufficient to permit the non-moving party to carry its

burden of proof. See Celotex v. Catrett, 477 U.S. 317, 327 (1986). Once the moving party has carried its burden under Rule 56, "its' opponent must do more than simply show that there is some metaphysical doubt as to the material facts." Scott v. Harris, 550 U.S. 372, 380 (2007). Under Fed. R. Civ. P. 56(e), the opposing party must set forth specific facts showing a genuine issue for trial and may not rest upon the mere allegations or denials of its pleadings. See Martin v. Godwin, 499 F.3d 290, 295 (3d Cir. 2007).

At the summary judgment stage the court's function is not to weigh the evidence and determine the truth of the matter, but rather to determine whether there is a genuine issue for trial. See Anderson, 477 U.S. at 249; Jiminez v. All American Rathskeller, Inc., 503 F.3d 247, 253 (3d Cir. 2007). In doing so, the court must construe the facts and inferences in the light most favorable to the non-moving party. See Horsehead Indus., Inc. v. Paramount Communications, Inc., 258 F.3d 132 (3d Cir. 2001). The court must award summary judgment on all claims unless the non-moving party shows through affidavits or admissible evidence that an issue of material fact remains. See, e.g., Love v. Rancocas Hosp., 270 F.Supp.2d 576, 579 (D.N.J. 2003); Koch Materials Co. v. Shore Slurry Seal, Inc., 205 F.Supp.2d 324, 330 (D.N.J. 2002).

### III.  DISCUSSION

Regis brings claims for defamation, commercial disparagement, tortious interference with contractual relations, and tortious interference with prospective contractual relations.[7]  The Court will address each claim in turn.

#### A.  Defamation (Count I)

Under Pennsylvania law, a plaintiff in a defamation action has the burden of proving the following:

---

[7] Regis has withdrawn Count V of the Complaint, which sought a declaratory judgment. (Pl.'s Res. Opp'n 10.)

       (1) The defamatory character of the communication.
       (2) Its publication by the defendant.
       (3) Its application to the plaintiff.
       (4) The understanding by the recipient of its defamatory meaning.
       (5) The understanding by the recipient of it as intended to be applied to the plaintiff.
       (6) Special harm resulting to the plaintiff from its publication.
       (7) Abuse of a conditionally privileged occasion.

42 Pa.C.S. § 8343(a). Once a plaintiff establishes these elements, the defendant has the burden

of proving the following, when relevant to the claim:

       (1) The truth of the defamatory communication.
       (2) The privileged character of the occasion on which it was published.
       (3) The character of the subject matter of defamatory comment as of public concern.

Id. § 8343(b). "A communication is defamatory if it tends to harm the reputation of another as

to lower him in the estimation of the community or to deter third persons from associating or

dealing with him." Maier v. Maretti, 448 Pa.Super. 276, 671 A.2d 701, 704 (Pa.Super.Ct.1995)

(citing Elia v. Erie Ins. Exchange, 430 Pa.Super. 384, 634 A.2d 657 (1993)). "A communication

is also defamatory if it ascribes to another conduct, character or a condition that would adversely

affect his fitness for the proper conduct of his proper business, trade or profession." Id. (citing

Gordon v. Lancaster Osteopathic Hosp. Ass'n, 340 Pa.Super. 253, 489 A.2d 1364

(Pa.Super.Ct.1985)). However, "communications which may annoy or embarrass a person are

not sufficient as a matter of law to create an action in defamation." Gordon, 340 Pa. Super. at

263, 489 A.2d at 1369. Importantly, only statements of fact, rather than mere expressions of

opinion, are actionable under Pennsylvania law. Moore v. Cobb-Nettleton, 889 A.2d 1262, 1267

(Pa.Super.Ct.2005) (internal citation omitted); see also Smith v. Sch. Dist. of Philadelphia, 112

F. Supp. 2d 417, 429 (E.D. Pa. 2000) ("[O]nly statements of fact can afford a basis for a

defamation action; expressions of opinion cannot.) (internal citation omitted). In order for an

opinion to be deemed capable of defamatory meaning under Pennsylvania law, it must

"reasonably be understood to imply the existence of undisclosed defamatory facts justifying the opinion." Remick v. Manfredy, 238 F.3d 248, 261 (3d Cir.2001) (internal citation omitted); see also Parano v. O'Connor, 433 Pa. Super. 570, 575, 641 A.2d 607, 609 (1994) (statements of a defendant's opinion "are not actionable unless they imply undisclosed, false[,] and defamatory facts.") (internal citations omitted).

In addition, "Pennsylvania courts recognize that a claim for defamation may exist where the words utilized themselves are not defamatory in nature, however, the context in which these statements are issued creates a defamatory implication, i.e., defamation by innuendo." Mzamane v. Winfrey, 693 F. Supp. 2d 442, 477 (E.D. Pa. 2010); see also Thomas Merton Ctr. v. Rockwell Int'l Corp., 497 Pa. 460, 467, 442 A.2d 213, 217 (1981); Bogash v. Elkins, 405 Pa. 437, 440, 176 A.2d 677, 679 (1962); Sarkees v. Warner-West Corporation, 349 Pa. 365, 367-368, 37 A.2d 544, 546 (1944) (all discussing defamation by innuendo). To establish defamation by innuendo, the "innuendo must be warranted, justified and supported by the publication." Thomas Merton Ctr, 497 Pa. at 467, 442 A.2d at 217; see also Sarkees, 349 Pa. at 367, 37 A.2d at 546. As further explained by the Pennsylvania Supreme Court:

> The purpose of an innuendo, as is well understood, is to define the defamatory meaning which the plaintiff attaches to the words; to show how they come to have that meaning and how they relate to the plaintiff[.] But it cannot be used to introduce new matter, or to enlarge the natural meaning of the words, and thereby give to the language a construction which it will not bear[.] It is the duty of the court in all cases to determine whether the language used in the objectionable article could fairly and reasonably be construed to have the meaning imputed in the innuendo. If the words are not susceptible of the meaning ascribed to them by the plaintiff and do not sustain the innuendo, the case should not be sent to a jury.... [Consequently,] [i]f the publication complained of is not in fact libelous, it cannot be made so by an innuendo which puts an unfair and forced construction on the interpretation of the publication.

Sarkees, 349 Pa. at 368, 369, 37 A.2d at 546. In the instant case, A.M. Best challenges that Regis has not, and cannot, prove two elements of a defamation action: (1) the defamatory

character of the communication, and (2) abuse of a conditional privilege. The Court's analysis will therefore be limited to these two issues.

### 1. **Capable of Defamatory Meaning**

A.M. Best first contends Regis cannot satisfy the first element of a defamation action. Specifically, Best argues its rating is merely a statement of its opinion, and therefore is not capable of defamatory meaning.  Regis counters that Best's rating is not "pure opinion speech" and therefore is not entitled to absolute protection.  The Court agrees with Regis.

Whether a contested statement is capable of defamatory meaning is a question of law for the court to determine. Blackwell v. Eskin, 2007 PA Super 20, 916 A.2d 1123, 1125 (Pa. Super. Ct. 2007) (citing Tucker v. Philadelphia Daily News, 577 Pa. 598, 848 A.2d 113, 123 (2004)). So long as a statement is capable of defamatory meaning, whether it was actually defamatory is a jury question. See Brophy v. Phila. Newspapers, Inc., 281 Pa.Super. 588, 422 A.2d 625, 628 (1980) (holding that the case must proceed past summary judgment if the statement is capable of defamatory interpretation).  In making this legal determination, the Court must view the statement in the context in which it was made. Baker v. Lafayette Coll., 516 Pa. 291, 296, 532 A.2d 399, 402 (1987) (internal citation omitted). "The touchstone in determining whether a statement is capable of defamatory meaning is how the statement would be interpreted by the average person to whom it was directed." Mzamane, 693 F. Supp. at 479; see also Marier v. Lance, Inc., 07-4284, 2009 WL 297713 (3d Cir. Feb. 9, 2009) ("In analyzing whether or not a statement is defamatory, Pennsylvania courts have held that '[t]he nature of the audience seeing or hearing the remarks is ... a critical factor in determining whether the communication is capable of a defamatory meaning.'") (internal citation omitted).

Here, Regis has identified four statements in Best's January 12, 2010 press release which it claims are capable of defamatory meaning. The press release stated Regis was being downgraded because of "the *recent* disclosure of the lack of financial flexibility at Regis' privately held parent, Tiber Holding Corporation (Wilmington, DE), due to that organization's high consolidated financial leverage, *lack of access to additional capital* and *other operating issues*. Additionally, these ratings actions consider *Regis' continued poor operating performance*." (Def.'s Ex. SS, "Press Release — January 12, 2010: A.M. Best Downgrades Ratings of Regis Insurance Company.") (emphasis added).

The Court agrees with Regis that some of these statements are capable of defamatory meaning. In its briefs, Best continually repeats that its ratings are opinions. Indeed, Best's publications emphatically state that its ratings are opinions.[8] However, Best entirely sidesteps the fact that even opinions are potentially defamatory if they could reasonably be understood by the average listener to imply the existence of undisclosed defamatory facts. <u>Remick</u>, 238 F.3d at 261; <u>Parano</u>, 433 Pa. Super. at 575. Best's sidestepping of this central issue is especially strange given that its brief cites language from <u>Parano</u> which makes clear that the "opinion" defense is conditional and not absolute.

It is undisputed that Regis' 2010 rating represented a substantial downgrade, so much so that the downgrade needed to be referred to a second voting committee to confirm the rating.

---

[8] For example, Best's 2010 and 2009 insurance reports both contain the following preface:

> A Financial Strength Rating is an independent <u>opinion</u> of an insurer's financial strength and ability to meet its ongoing insurance policy and contract obligations. It is based on a comprehensive quantitative and qualitative evaluation of a company's balance sheet strength, operating performance[,] and business profile.

> The Financial Strength rating <u>opinion</u> addresses the relative ability of an insurer to meet its ongoing insurance obligations….A Financial Strength Rating is not a recommendation to purchase, hold[,] or terminate any insurance policy, contract[,] or any other financial obligation issued by an insurer, nor does it address the suitability of any particular policy or contract for a specific purpose or purchaser.

(Def.'s Exs. M & N at Important Notice.) (emphasis added).

The parties, in their briefs, devote a substantial amount of time and space to detailing the history between their companies, Regis' ratings history, and the back and forth discussions, letters, meetings, and votes that went into formulating Regis' 2010 rating. And yet, Best's press release conveys none of the same information. Best's press release is barely more than a page and neglects to mention — let alone disclose — the details of how Best arrived at such a substantial downgrade. That is to say, Best's press release is almost entirely devoid of context. When all the facts are disclosed, an opinion cannot be defamatory because the listener is able to evaluate the facts for himself and is free to disregard the conclusion the speaker made from these facts. See Restatement (Second) of Torts § 566A; see also Mzamane, 693 F. Supp. 2d at 481. But when an opinion discloses only *some* of the facts on which it based, it is capable of defamatory meaning and therefore actionable. See Milkovich v. Lorain Journal Co., 497 U.S. 1, 18-19, 110 S. Ct. 2695, 2705-06, 111 L. Ed. 2d 1 (1990) ("Even if the speaker states the facts upon which he bases his opinion, if those facts are either incorrect or incomplete, or if his assessment of them is erroneous, the statement may still imply a false assertion of fact. Simply couching such statements in terms of opinion does not dispel these implications….")

The Court finds that, without providing additional information, analysis, and context, it was misleading for Best to suggest that there had been a "*recent* disclosure of the lack of financial flexibility at Regis' privately held parent, Tiber Holding Corporation." Best's use of the term "recent" implies that something vague and unspecified had happened at Tiber in the last year to render it financially inflexible, and thereby putting Regis at risk. But in reality, Tiber had been insolvent for almost ten years at the time Best published its press release. News of Tiber's financial condition was only "recent" in the sense that Best had recently learned of it.[9] There is a

---

[9] The Court finds it strange that Best offers no explanation as to why it never asked Regis for Tiber's financial statements prior to 2009. For all the emphasis Best now places on how important the financial health of the parent company is in determining the rating of a subsidiary, it seems questionable that Best did not ask Regis for Tiber's financial statement before 2009. Prior to 2009, it seems that Best was perfectly content to take Regis' representatives

marked and appreciable difference between implying that Regis' parent company is experiencing recent financial difficulties and clearly stating that Regis has been operating for almost ten years *despite* its parent company's financial difficulties (and that Best is only now learning of it). Ultimately, it is for Best's readers to decide whether they still want to do business with Regis despite the risk posed by the insolvency of Tiber. But Best's readers lack the ability to make an informed decision on that point if Best deprives them of the information necessary to do so.

In addition, the Court also finds the press release's assertion that Regis was being downgraded because of Tiber's "*lack of access to additional capital and other operating issues*" to be capable of defamatory meaning. Best's allusion to "other operating issues" is vague on its face. With respect to the first clause of this sentence, Best's reference to Tiber's "lack of access to additional capital" is presumably intended to imply that, because Regis is Tiber's lone asset, Tiber's judgment-holder would go after Regis in order to satisfy the debts owed by Tiber. The Court agrees that Tiber's lack of access to additional capital is a business concern that could legitimately affect Regis' rating. Indeed Best's briefs, once again, have devoted substantial space to exhaustively detailing the collection efforts of the NY Liquidator. These details, though, were omitted from the press release. The press release fails to disclose that despite other numerous collection efforts, the NY Liquidator had never attempted to seize Regis. So while it is, of course, possible for the NY Liquidator to attempt to seize Regis (thereby making Regis an unsafe company with which to place insurance), the fact that the NY Liquidator had not successfully done so in almost ten years would be vital information for Best's readers to know.

The Court likewise finds the press release's statement that Best's ratings decision also took into account "*Regis' continued poor operating performance*" to be capable of defamatory

at their word that there was "no debt" at Tiber and that its financial condition was sound. (Def.'s Mot. Summ. J. 6.)

meaning. It is unclear what Best even means by its use of the word "continued." Best rated

Regis at a B+ (Very Good) for four straight years prior to the 2010 ratings debacle. Even

assuming Regis had a poor operating performance (which Best has not proved), by Regis' own

estimation that poor performance only recently occurred. There is nothing "continued" about a

precipitous drop after four straight years of favorable ratings.

Accordingly, the Court finds that Best's rating, as reflected in the press release, is

capable of defamatory meaning because it is an "opinion" that implies the existence of

undisclosed defamatory facts. The Court also finds that the press release is potentially

defamatory by innuendo.[10]

### 2. Abuse of a Conditional Privilege

Best next argues that Regis cannot establish the seventh element of a defamation action:

that Best abused its conditional privilege by publication of statements regarding Regis.

Under Pennsylvania law, "a publisher of a defamatory statement is not liable if the

statement was made subject to a conditional privilege and the privilege was not abused." Elia v.

Erie Ins. Exchange, 430 Pa.Super. 384, 634 A.2d 657, 660 (1993) (citing Chicarella v. Passant,

343 Pa.Super. 330, 494 A.2d 1109, 1112-13 (1985)). One instance in which a conditional

privilege arises is "when a recognized interest of the public is involved." Id. (internal citation

omitted); see also 42 Pa.C.S. § 8343(a)(2) & (3). The court determines whether a privilege

applies, but the jury considers whether that privilege was abused. Bargerstock v. Washington

Greene Community Action Corp., 397 Pa.Super. 403, 411, 580 A.2d 361, 364 (1990) (citing

Montgomery v. Dennison, 363 Pa. 255, 69 A.2d 520 (1949)).

---

[10] The theory of "defamation by innuendo" was not advanced by Regis, but the Court nonetheless finds this theory to
be applicable to the facts of this case.

Once a matter is deemed conditionally privileged, the plaintiff has the burden of establishing that the defendant abused that conditional privilege. Chicarella, 343 Pa. Super. at 337, 494 A.2d at 1112-13. Abuse of a conditional privilege is indicated when the publication: (1) is actuated by malice or negligence; (2) is made for a purpose other than that for which the privilege is given; (3) is made to a person not reasonably believed to be necessary for the accomplishment of the purpose of the privilege; or (4) includes defamatory matter not reasonably believed to be necessary for the accomplishment of the purpose. Beckman v. Dunn, 276 Pa. Super. 527, 537, 419 A.2d 583, 588 (1980) (citing Restatement (Second) Torts § 599 (1976)). In the context of a defamation claim, actual malice means the speaker acted with knowledge that a published statement is false or that the speaker acted with reckless disregard for the truth or falsity of the statement. New York Times Co. v. Sullivan, 376 U.S. 254, 279-80, 84 S. Ct. 710, 726, 11 L. Ed. 2d 686 (1964); see also Marcone v. Penthouse Int'l Magazine for Men, 754 F.2d 1072, 1080-81 (3d Cir. 1985).

Here, Best contends that it is entitled to a conditional privilege because it speaks on matters of public concern. The Court agrees, as does Regis. (See Compl. 1.) ("Agents, brokers, businesses[,] and individuals look to the A.M. Best rating as the definitive statement on the health of an insurance company.") As a publisher of insurance company ratings, Best provides vital information to the public about the financial condition of the companies it rates. Having determined that a conditional privilege applies, the question becomes whether Best abused that conditional privilege.

The Court finds that there is a genuine issue of material fact on this point. The Court finds it necessary at this juncture to distinguish between the two interrelated communications/statements that are at issue in this case: (1) the rating itself and (2) Best's press

release, which is a reflection of the rating. A rating, standing alone, is an opinion, as Best adamantly avers. A rating, unless patently baseless, has no inherent truth; it is merely an estimation, arrived at through application of Best's methodologies, of the financial health of the rated organization. But in order for Best's "ratings opinion" to be entitled to the protection generally afforded to opinions in defamation actions, Best's methodologies must have actually been followed. Here, there remains a genuine issue of material fact as to whether Best followed its own methodologies in this particular instance. Regis' expert stated in his report that Best' analysis of Regis was flawed and inconsistent with Best's stated methodologies. Best's expert concluded otherwise. The source of controversy appears to be whether Best placed too great an emphasis on the judgments in reaching its ratings decision. In general, the Court does not doubt that Best, based on its stated methodologies, has every right to consider the financial condition of a parent holding company in rating a subsidiary organization. Accordingly, the Court patently rejects any assertion by Regis that Best should not or could not consider Tiber's financial condition in reaching its ratings decision on Regis.

The Court also rejects Regis' assertion that Best "failed" to investigate its concerns by choosing not to contact the NY Liquidator directly. Nothing in the record suggests that Best was under any obligation to contact the NY Liquidator directly.[11] Moreover, nothing in the record suggests that Regis ever requested that Best contact the NY Liquidator directly. Conversely, Regis *did* request that Best contact the Stephen Johnson at the PA DOI. Best complied, and contacted Johnson on two separate occasions. If Regis truly wanted Best to contact the NY Liquidator directly, it could and should have encouraged Best to do so — just as it did in

---

[11] Both Best and its expert have indicated that it is Best's policy not to contact third parties without the rated entity's express permission. This seems to be a prudent policy, especially given the obvious risks involved in contacting the NY Liquidator.

encouraging Best to contact Johnson. In general, the Court must recognize that Best made substantial efforts to cooperate with Regis as part of its rating process. Among other things, Best personnel met or spoke with members of Regis' senior management, communicated with Mr. Di Loreto on multiple occasions, spoke with Johnson twice, conferred with Regis' accountant on numerous occasions, conducted three separate committee meetings regarding Regis, considered Regis' appeal of its rating, and revised its initial rating of Regis. This entire process appears to have been democratic and collaborative, and the Court does not believe that Best made the decision to downgrade Regis lightly.

Nonetheless, there remains a question of whether Best's rating of Regis placed too great an emphasis on the mere existence of the judgments without giving enough consideration to other mitigating factors (such as the age of the judgments and the PA DOI's stated position on what impact Tiber's judgments could have on Regis). Best, of course, is under no obligation to accept either Regis' opinion of its own financial health or the PA DOI's position on whether it would allow Regis to be seized.[12] The age of the judgments does not eliminate the possibility that Regis could be seized. But it does, as Regis argues, cast doubt on whether that possibility would come to pass. A reasonable jury could find that it was reckless for Best to arrive at such a substantial downgrade knowing that other factors suggest the judgments are not as damning as Best contends.[13]

Further, as previously discussed at length, the Court finds that the press release — with its lack of context and inadequate language — is capable of defamatory meaning. A reasonable jury could find that it was an abuse of Best's conditional privilege for it to publish the press release without adequately disclosing the bases of Best's ratings decision.

---

[12] As Best has argued, a change in policy or leadership at the PA DOI could easily put Regis at risk of seizure.

[13] The Court also rejects any assertion by Regis that Best should have not downgraded it at all.

Based on the foregoing, the Court declines to grant A.M. Best summary judgment on the Regis' defamation claim.

## C. Commercial Disparagement (Count II)

Under Pennsylvania law, in order to prevail on a claim for commercial disparagement, a plaintiff must show that the defendant published a statement about plaintiff's business to another, and: (1) the statement was false; (2) the publisher either intended the publication to cause pecuniary loss or reasonably should have recognized that publication would result in pecuniary loss; (3) pecuniary loss did in fact result; and, (4) the publisher either knew the statement was false or acted in reckless disregard of its truth or falsity. Pro Golf Mfg., Inc. v. Tribune Review Newspaper Co., 570 Pa. 242, 246, 809 A.2d 243 (2002) (citing Restatement (Second) of Torts § 623(A) (1977)); see also Neurotron v. Medical Serv. Assoc. of Pa., Inc., 254 F.3d 444, 448–49 (3d Cir.2001); Bro-Tech Corp. v. Thermax, Inc., 651 F. Supp. 2d 378, 416 (E.D. Pa. 2009).

Here, A.M. Best reiterates the same arguments it made with respect to Regis' defamation claim. Thus, according to Best, for all the reasons Regis' claim for defamation fails, its claim for commercial disparagement must also fail. The Court has already found that Regis' defamation claim demonstrates genuine issues of material fact. The Court therefore also finds that Regis' commercial disparagement claim demonstrates genuine issues of material fact. See QVC, Inc. v. MJC Am., Ltd., CIV.A. 08-3830, 2011 WL 2843746 (E.D. Pa. July 18, 2011) ("The legal standards applicable to defamation claims — including those for determining the truth or falsity of statements — are appropriately applied in determining the sufficiency of [a] claim for commercial disparagement.); Gilbert v. The Bionetics Corp., No. 98–2668, 2000 WL 807015, at *3–9 (E.D.Pa. June 6, 2000). Best is therefore not entitled to summary judgment on Regis' commercial disparagement claim.

**D. Tortious Interference with Contractual Relations (Count III) and Tortious Interference with Prospective Contractual Relations (Count IV)**

Under Pennsylvania law, the elements of a cause of action for tortious interference with a contractual relation, whether existing or prospective, are as follows:

> (1) the existence of a contractual, or prospective contractual relation between the complainant and a third party;
> (2) purposeful action on the part of the defendant, specifically intended to harm the existing relation, or to prevent a prospective relation from occurring;
> (3) the absence of privilege or justification on the part of the defendant; and
> (4) the occasioning of actual legal damage as a result of the defendant's conduct.

Strickland v. Univ. of Scranton, 700 A.2d 979, 985 (Pa. Super. Ct. 1997) (citing Pelagatti v. Cohen, 370 Pa.Super. 422, 434, 536 A.2d 1337, 1343 (1987)). Best contends that Regis cannot establish the second element — i.e., that it intended to harm Regis' contractual relations. Regis argues that the record supports an inference that Best was motivated to harm Regis because it was "upset" by not having learned of the judgment against Tiber for almost ten years. Under Regis' theory, Altonji and Liebowitz were "angry" and "embarrassed" when they learned of the judgments, and therefore intended to "punish" Mr. Di Loreto and Regis for their perceived deception.

The Court agrees with Best. Nothing in the record supports Regis' contention that Best specifically intended to harm Regis' existing or prospective contractual relations. As previously discussed, the Court believes that Best's 2010 ratings decision was the result of a democratic and collaborative deliberative process. If Best were "upset," "embarrassed," or "angry" about not having learned of the judgments earlier, then it never would have worked with or accommodated Regis to the extent that it did. In particular, it makes very little sense for Regis to attempt to attribute wrongdoing to Altonji and Leibowitz when the two analysts, as Regis concedes, actually recommended to the ratings committee that Regis' 2009 rating be affirmed. Moreover, it was the CRC, not Altonji and Leibowitz, that voted to downgrade Regis.

Further, nothing in the record supports the argument that Best downgraded Regis for the express purpose of causing it to lose existing or prospective business. It is clear that the very purpose of Best's ratings is to apprise the public of the potential risks involved in placing insurance with the rated entity. It is, of course, possible that if a rated entity is downgraded, this could cause harm to its business. But such harm is not the specific intent of the rating. It is merely an indirect effect.

Accordingly, the Court will grant Best's motion for summary judgment with respect to counts III and IV.

## V. <u>CONCLUSION</u>

For the reasons set forth above, Defendant A.M. Best's Motion for Summary Judgment is granted with respect to Counts III and IV and denied with respect to Counts I and II. Count V, which Plaintiff Regis Insurance Company has voluntarily withdrawn, is dismissed with prejudice.

An appropriate order follows.