## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

REGIS INSURANCE COMPANY,        :
      :      C.A. No. 10-3171
         *Plaintiff,*      :
      vs.      :
      :      **JURY TRIAL DEMANDED**
A.M. BEST COMPANY, INC.,      :
      :
         *Defendant.*      :

### PLAINTIFF'S TRIAL BRIEF

Plaintiff Regis Insurance Company ("Regis"), by and through its undersigned counsel, hereby files this Trial Memorandum in accordance with Fed.R.Civ.P. Rule 16 and Local Rule 16.1(c).[1]

### I. STATEMENT OF NATURE OF CASE AND COURT'S JURISDICTION

Plaintiff Regis brings this civil action alleging two claims to be tried: (i) defamation; and (ii) commercial disparagement.[2]  Originally, the complaint alleged five counts, three of which have been dismissed. The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332, because there is complete diversity among the parties and the amount in controversy exceeds

---

[1]       Although not required, at the pre-trial conference that took place before the Court on April 14, 2013, defendant A.M. Best indicated that it would like to file a memorandum regarding proof of damages.  The parties seem to have a substantial difference of opinion as to the state of the law of damages as applied in this case.  This memorandum is submitted in order to state the plaintiff's position with respect to its position as to damages.

[2]       The Pennsylvania Supreme Court uses "commercial disparagement" interchangeably with the term "injurious falsehood." *Pro Golf Mfg. v. Tribune Review Newspaper Co.,* 570 Pa. 242, 247 (2002).  For purposes of this trial, plaintiff chooses to use the term "commercial disparagement."  It should be noted that the Pennsylvania Suggested Standard Civil Jury Instructions refer to the tort as injurious falsehood, but that is of no particular importance.

$75,000. Regis Insurance Company is a Pennsylvania Insurance Company. A.M. Best Company, Inc. is a New Jersey corporation.

## II.  STATEMENT OF FACTS

A.  Background on the Parties.

1.  Regis Insurance Company

Regis Insurance Company, Inc. ("Regis") is a property and casualty insurance company operating out of offices in Wayne, Pennsylvania. Regis is owned by a holding company, Tiber Holding Corporation ("Tiber"). Tiber's lone asset of value is Regis. Tiber is dormant and its only function is to hold Regis and a few other shell corporations that are no longer operating companies.

Regis underwrites commercial policies of insurance. It has operated in a niche market for over 30 years. Regis is operated by Richard A. Di Loreto, who is the over 90 year-old President of the company and has been at its helm for the vast majority of its existence. There was a brief period of time in 2009-early 2010 in which someone other than Mr. Di Loreto served as the President of the company. Mr. Di Loreto is currently the President of Regis. Regis has been rated by A.M. Best Company, Inc. ("A.M. Best" or "Best") every year since the mid-1980's.

2.  A.M. Best

In business since 1899, Best holds itself out on its website as "the leading information provider for the global insurance industry." Further, Best describes itself as a "company devoted to issuing in-depth reports and financial strength ratings" and offering "the largest coverage of insurers and reinsurers in the United States, Canada, the United Kingdom and worldwide of any interactive rating organization." Indeed, it is considered the bellwether of insurance company analysis. Agents, brokers, businesses and individuals look to an insurance company's A.M. Best

2

rating as the definitive statement on the financial health of a particular insurance company. Representatives of A.M. Best have conceded in this litigation that they are aware that an insurance company's viability in the marketplace will rise or fall on its Best rating.

A.M. Best's rating process involves one annual meeting with the entity to be rated and a review of materials such as balance sheets, financial statements, filings with the company's regulating authority and any other written material requested by A.M. Best at the meeting. A.M. Best analysts take the information provided and apply various published (and some proprietary) formulae and methodologies to the information in order to develop a rating for the entity. The rating will include a financial strength rating, a credit issuer rating and a predictive outlook for the coming year. See, Ex. H, Preface from 2010 Best's Insurance Reports. After a preliminary analysis has been completed by the analytical team, it is presented to a Peer Review Committee comprised of senior A.M. Best executives and the analytic team. A vote is taken as to the appropriate rating to be given to the insurance company based on the analysis.

A.M. Best analyzes an insurance company's financial strength ("FSR") and its ability to meet its ongoing obligations to its insureds. This rating is based upon a review of a company's balance sheet, operating performance and business profile. In connection with this rating, Best engages in both a "top-down" and "bottom-up" analysis to assess sources of risk to a rated entity. This analysis includes consideration of risk as a result of activity at the parent company. This would include an assessment of whether the parent company can place a call on the capital of the insurance company subsidiary/affiliate. Best strives to analyze only reasonable risk to the rated company. Far-fetched risk is not supposed to be part of the analysis.

One component of the rating is the assignment of a Best's Capital Adequacy Ratio ("BCAR score"). The BCAR score involves a quantitative review of an insurance company's

risk-adjusted capitalization. The higher a company's BCAR score, the more financially healthy the company is considered to be by A.M. Best's standards.

Using Best's published methodology for Understanding BCAR in 2009, Regis' score would have been A++ in January 2010. In fact, Regis' BCAR score has been in the A++ range consistently since 2004. A++ is the highest possible BCAR score.

B.      Regis' Rating History Was Positive Until 2010.

It is undisputed that over the decades in which Regis has been rated by Best, Regis' has enjoyed positive ratings. From 2000-2009, Regis was never given an FSR of less than a B. In 8 out of 10 of those years, Regis was rated B+ (Good). Regis was consistently rated at that level from 2005-2009. However, Regis was downgraded to B- in January, 2010. This rating assignment was the culmination of Best's annual review of Regis, which began in November, 2009.

C.      A.M. Best Downgraded Regis in 2010.

1.      For the First Time Since Regis Had Been Rated By Best, Best Requested Tiber's Financial Statement In Connection with Regis' 2010 Annual Rating Analysis.

Regis' 2010 rating analysis began with a meeting on November 12, 2009 at Best's offices with Regis' then-president, Jim Moll and comptroller, Sharon Rinaldo. This meeting was the first (and only) meeting with Best in Regis' history that Mr. Di Loreto did not attend. During that meeting, a request was made for Regis to produce a financial statement for its parent company, Tiber. This was the first time Best had a financial statement for Tiber. Best has been aware of the relationship between Regis and Tiber since at least 2000 (as noted in Best' Insurance Report on Regis of that year).

Following the meeting, Marc Liebowitz, the Best ratings analyst following Regis, reiterated the request for a copy of Tiber's audited financial statement. Best acknowledges this is

4

the first written request ever made by them for Tiber's audited financial statement in the over twenty year history of rating Regis. A copy of Tiber's audited financial statement was immediately provided to Best. Because of a clerical error at Best, the financial statement did not reach the property and casualty analytic team until approximately December 3, 2009, although it had been date stamped as received by the life/health rating division on November 16.

Tiber's audited 2008 financial statement reflects that Tiber is insolvent. According to the footnotes in the statement, there are two judgments against Tiber. One of the judgments was entered by consent and has grown in value to over $40 million including interest. This judgment was entered against Tiber in 2001 arising out of a lawsuit involving a now defunct insurance company in New York, once operated by Di Loreto. The judgment is held by the New York Department of Insurance Liquidation Bureau ("judgment holder" or "Liquidator"). Tiber was that company's parent as well. Thus, Tiber has been (technically) insolvent since that time. The judgment is and always has been a matter of public record.

Regis has always disclosed to Best, and to any insurance authority to which it was required to report, that Tiber is its parent, and A. M. Best has acknowledged this fact in each of its Best's Insurance Reports. Further, Regis' annual statement, which is filed each year with insurance departments in every state in which it does business, reflects that Regis' tax return is filed as a consolidated return with its parent, Tiber. A copy of this statement is provided to A.M. Best each year in connection with the rating analysis.

> 2.    A.M. Best Accuses Mr. Di Loreto of Misrepresenting Tiber's Financial
>        Condition for Years.

On December 4, 2009, one day following receipt of Tiber's audited financial statement, Gerard Altonji and Marc Liebowitz (A. M. Best's supervisory analyst and primary analyst, respectively, responsible for conducting the ratings analysis of Regis) called Mr. Di Loreto.

They were upset by what they learned from the financial statement about Tiber's financial condition.  In the call, they accused Mr. Di Loreto of being a liar.  Mr. Di Loreto steadfastly denied having deceived Best.  Indeed, there is no proof in Best's file that such information about Tiber had ever been requested.  In this conference call, as well as in others that took place throughout December 2009, Mr. Di Loreto took the position that he had not misrepresented Tiber's condition and that Tiber's financial condition had no impact at all on Regis.  There were several teleconferences between Mr. Di Loreto and the Best analytic team between December 4, 2009 and December 14, 2009.

> 3.     A.M. Best Looks to the Pennsylvania Insurance Department for More Information, But Then Disregards It.

Unlike an ordinary business that may be seized to satisfy the debts of its parent company, an insurance company cannot be touched without permission of the regulating authority.  Mr. Di Loreto informed Mr. Altonji and Mr. Liebowitz that Stephen Johnson, Deputy Insurance Commissioner of the Pennsylvania Insurance Department would confirm that Pennsylvania would not allow the Liquidator to seize Regis to satisfy Tiber's debts.  Accordingly, Mr. Di Loreto urged Mr. Altonji and Mr. Liebowitz to speak to Mr. Johnson.  Their notes indicate that they, along with their superiors, spoke with Mr. Johnson on December 11, 2009.  Mr. Johnson confirmed that Regis could not be seized by the New York Liquidation Bureau in order to satisfy Tiber's debt.[3]  A second conversation between Best and Mr. Johnson took place on January 5, 2010.  Mr. Johnson also dismissed concerns that Regis could be seized in this conversation.

---

[3]     Mr. Johnson disclosed in this conversation that the New York Liquidation Bureau had effectively blocked a potential sale of Regis when it refused to take the proceeds of the sale in exchange for satisfaction of the total debt.  Understandably, the potential buyer refused to purchase Regis if it could not do so without this encumbrance.

Mr. Johnson provided the Best team with information about the Tiber judgment and the regulator's perspective on the impact of that judgment on Regis. From the Pennsylvania Insurance Department's position, Regis was a financially viable company, was not in need of special supervision and there was no concern about Tiber's debt. A.M. Best did not contact the judgment holder for information.

        4.       **The Peer Rating Committee Met to Rate Regis on December 14, 2009, and Altonji Alone Voted to Maintain Regis' 2009 Rating.**

The A.M. Best Peer Rating Committee ("PRC") met to review Regis on December 14, 2009 and voted to downgrade Regis from B+ to C+ (4 rating levels lower, a rating downgrade of extraordinary magnitude). Although they were displeased with the dire picture of Tiber's financial condition, an internal A.M. Best memorandum suggests that even in the face of Tiber's audited financial statement results, Altonji and Liebowitz believed that Regis was still financially sound and should receive a financial strength rating of B+ for the year 2010 with a stable outlook, and made this recommendation to A. M. Best's Property and Casualty Peer Rating Committee (PRC). The PRC disagreed.

Because the rating was so drastically downgraded, the PRC requested that the rating be reviewed by the Corporate Ratings Committee ("CRC"), which ratified the C+ rating assignment on December 16, 2009. A president's letter was issued to Regis reflecting the rating decision.

        5.       **Regis Appealed the Rating Decision.**

When Mr. Di Loreto was made aware that Regis was to be downgraded so substantially, he initiated an appeal of the C+ rating. In support of the appeal, he hired Linda Kaiser Conley, Esquire of Cozen O'Connor (the Philadelphia law firm) and a former Commissioner of the Pennsylvania Department of Insurance, to write an opinion letter to Best stating why Regis could not be seized to satisfy Tiber's debts and as such was not impacted by Tiber's theoretical

financial inflexibility.  Ms. Conley wrote a letter to Mr. Altonji dated December 20, 2009

explaining Regis' position.  Mr. Di Loreto also enlisted assistance from Regis' longtime outside

accountant, Earl W. Helstrom.  There was a substantial exchange of correspondence that

subsequently went back and forth between Mr. Di Loreto, Ms. Conley, Mr. Earl Helstrom and

representatives from A. M. Best.

On January 6, 2010, a more senior ratings committee reviewed Regis' appeal and

changed the rating from C+ to B-.  Notwithstanding Regis' legitimate requests to raise the rating

from B- to B+, supported by Regis' demonstrably strong capitalization and very high BCAR

score, Best published its new rating for Regis, which was B-.  Ex. A.  Because this was a

downgrade, according to Best policy, a press release was issued announcing the decreased rating.

Ex. A.  The press release stated that "A.M. Best Co. has downgraded the financial strength rating

to B- (Fair) from B+ (Good) and issuer credit rating to 'b-' from 'bbb-' of Regis Insurance

Company (Regis) (Wayne, PA)."  The press release goes on to state "the outlook for both ratings

has been revised to negative from stable."  The press release further indicated that "the

downgrade was meant to reflect a recent disclosure of lack of financial flexibility at Regis'

privately held parent, Tiber Holding Corporation (Tiber) (Wilmington, DE).  The downgrade

was also meant to reflect "Regis' poor operating performance."

> 6.  Regis Tirelessly Attempted to Convince A.M. Best to Reconsider the B-
>     Rating.

Following the publication of the rating, Mr. Di Loreto continued to seek what he felt

were justified changes in the rating report.  At Mr. Di Loreto's request, Stephen Johnson wrote a

letter to A. M. Best representatives memorializing his stated position during their telephone

conversations.  Best's failure to accept Mr. Johnson's reassurance is a clear departure from its

stated methodology, which unequivocally states that Best defers in all circumstances to a

company's regulating authority.  As a representative of the Pennsylvania Insurance Department,

Stephen Johnson speaks for Regis' regulating authority.  Mr. Di Loreto also wrote directly to

Arthur Snyder, President of A.M. Best and Andrew Colannino, another Best senior executive.

A.M. Best was unconvinced.

       D.     Regis Has Lost Substantial Business As a Result of the Downgrade.

      Regis continues to accrue underwriting loss as a result of the downgrade.  Since January

2010, many of Regis' policyholders have stopped renewing their policies.  Certain brokers who

used to direct clients to Regis policies no longer continue to do business with Regis.  Some have

stated that it is because of Regis' B- rating.

       E.     Regis Attempts to Mitigate Loss.

      Notwithstanding these losses, Regis continues to operate.  To meet its underwriting

requirements, it has lowered its standards for applications and now insures greater risks than it

would have in other times.  Regis also filed this lawsuit in attempts to recover the money it has

lost and in attempt to restore its rating to B+.

## III.   DAMAGES

      Regis Insurance Company seeks compensatory damages for both financial and

reputational losses resulting from the defamatory statements published by A.M. Best.  The

derivation of the losses in each of these two categories is as follows:

       A.     ACTUAL LOSS

      Since the rating downgrade of Regis by A.M. Best in early January, 2010, Regis's surplus

has diminished by 48%, from $8,766,000 at year-end 2009 to $4,565,000 at year-end 2012, for a

total loss of $4,201,000.  This dramatic loss was a direct result of multiple adverse business

developments directly related to the publication of the diminished rating and associated press

release.  In addition, premium has steadily dropped from $4,453,000 of premium written in 2009, to a low of $3,266,000 of premium written in 2012.  This is a drop of 26.7% in three years. Underwriting results deteriorated as well, both in terms of financial losses and combined ratio (losses and loss adjustment expenses relative to earned premium).  Regis' underwriting losses averaged $2,235,000 in the years 2010-2012 as compared to underwriting loss of $1,299,000 in 2009.  Regis' combined ratio averaged 161% in the years 2010-2012 as compared to a combined ratio of 129% in 2009.

### B.    REPUTATIONAL HARM

It is nearly impossible to quantify the value of one's reputation.  That said, the actual losses as described above, provide some indication of the value of Regis' good name.  Indeed, following the publication of the Press Release at issue, Regis' business has steadily declined. Regis' reputation in the marketplace has been seriously damaged.  It is likely that those producers and customers who have determined that they cannot do business with Regis because it carries a below investment grade (B+) rating, are unlikely to return to Regis.

### C.    FUTURE LOSS

Given that Regis' underwriting results are directly connected to the timing of the Press Release, it is reasonable to infer that harm to Regis will befall it at the same rate.  Regis is approximately $1,000,000 worse financially on an annual basis.  This damage is likely to linger for the indefinite future, for at the very least 10 years, or however long Regis continues to survive.  As such, future loss damage is $10,000,000.

## IV.     LAW APPLICABLE TO THIS CASE

   A.     Undisputed Elements of the Claims to Be Proven at Trial

   To prove defamation, Regis must and will prove at trial: (i) the defamatory nature of the communication; (ii) its publication by A.M. Best; (iii) its application to Regis; (iv) the understanding by the recipient of its defamatory meaning; (v) the understanding by the recipient of it as intended to be applied to Regis; (vi) special harm resulting to Regis from its publication; and (vii) abuse of a conditionally privileged occasion.  42 Pa.C.S. § 8343(a).

   The Court has already determined that as a matter of law that certain statements contained in the January 12, 2010 Press Release at issue are capable of a defamatory meaning. (See, Summary Judgment Opinion, Doc. No. 50). There has been no dispute between the parties that the statements were published by AM Best, that they are applicable to Regis.  Thus, Regis will prove to the jury that the potentially defamatory statements are in fact defamatory, and that A.M. Best abused a conditional privilege when making the statements.  The facts as stated above, prove each of these elements.[4]

   To prove commercial disparagement, Regis must demonstrate: (i) the statement made was false; (ii) the publisher either intended the publication to cause pecuniary loss or reasonably should have recognized that publication would result in pecuniary loss; (iii) pecuniary loss did in fact result; and  (iv) the publisher either knew the statement was false or acted in reckless disregard of its truth or falsity.  *Pro Golf Mfg., Inc. v. Tribune Review Newspaper Co.,* 570 Pa.

---

[4]     For a more detailed explanation of how each fact supports each element, please see Plaintiff's Memorandum in Opposition to Motion for Summary Judgment (Doc. No. 47). This document is also instructive on how the facts prove Regis' Commercial Disparagement claim.

242, 246 (2002).  As to this claim, assuming Regis prevails on the elements of its defamation

claim, it will also prove its commercial disparagement claim.[5]

  B.  Potential Legal Issues

  As a general proposition, defamation and commercial disparagement, though they

concern the First Amendment are state law claims.  Indeed, this Court sits in its diversity

jurisdiction.  Therefore, the applicable substantive law to be applied here is Pennsylvania law.

To the extent the standards are co-extensive, the law can be interchangeable.  But, substantive

Third Circuit precedent, which does not rely on Pennsylvania law, is not binding here. Therefore,

when applying legal standards in this case, the Court should look to Pennsylvania law for

guidance.

    1.  There is no Pennsylvania or Third Circuit law mandating that absolute
        privilege be afforded to A.M. Best's Rating Report.

  Most recently in its motion to certify this matter for immediate interlocutory appeal,

which was denied, A.M. Best argued that the Third Circuit's recent decision in *Kendall v. Daily*

*News Publ'g Co'*, ---F.3d---, No. 11-4162, 2013 WL 856433 (3d Cir. March 8, 2013) creates a

rule in the Third Circuit that ratings agencies are immune from liability. Indeed, this Court

rejected that position in its Order denying the motion for immediate interlocutory appeal (Doc.

No. 60).  Not only does no such rule exist in the Third Circuit, but *Kendall* does not even involve

a publication by a ratings agency.  *Kendall* simply reiterates the standard for proof of actual

malice.  Indeed, the Court determined in its Opinion that Best knew that the judgment against

Tiber was entered almost a decade before it published the rating and press release in question.

---

[5]  Regis understands that A.M. Best believes that Regis must demonstrate abuse of
conditional privilege with respect to this claim.  But, the law here is clear, as advanced by the
Pennsylvania Supreme Court in *Pro Golf Mfg. Pro Golf Mfg., Inc* 570 Pa. 246-47.  Regis
reserves the right to respond to A.M. Best's position after having an opportunity to read A.M.
Best's Trial Brief, which must surely spell out its position in specific terms.

Thus, for example, Regis will prove at trial, among other things, that Best *knew* that the judgment against Regis' parent was not "recent."

Best also seems to believe based on its motion for interlocutory appeal that *Kendall* creates a more rigid legal standard of proof of defamation in the Third Circuit, but it does not. Indeed that case merely establishes that the Virgin Islands new law of defamation is consistent with the state of the law on the issue in the Third Circuit generally. As such, A.M. Best's request to insert language from *Kendall* into the jury's charge is unnecessary, because the Pennsylvania Standard Civil Jury Instructions are sufficient to inform the jury of the state of defamation law in Pennsylvania. There is no need to insert additional language, which may create confusion.

Also with respect to liability, A.M. Best believes that ratings statements are to be afforded absolute protection. In support of its position, A.M. Best has repeatedly asked this Court to apply or otherwise consider a case out of the Sixth Circuit, which has not been adopted here. *Compuware Corp. v. Moody's Investor's Servs., Inc.,* 499 F.3d 520, 527 (6th Cir. 2007). The Court is not bound by any decision made by the Sixth Circuit.

There is no reason to rehash arguments already reviewed by the Court on summary judgment and reasserted in connection with the motion for interlocutory appeal. There is no change in the law which would require the Court now to reconsider its decision to reject Best's argument that ratings agencies should be afforded absolute protection. As the Court has noted in its summary judgment opinion (Doc. No. 50), to the extent Best deviated from its stated methodologies and/or Regis can prove at trial that the statements made in the rating are provable and defamatory, Regis has been defamed. It remains to be seen whether a jury will view the facts in the light most favorable to Regis, but at this stage of litigation this Court must, and so, too, will the Third Circuit.

13

2.      Regis is entitled to recover intangible damages such as harm to its reputation.

Regis and A.M. Best do not agree as to the law of damages to be applied in this case.[6]

A.M. Best has suggested that Regis is not entitled to recover damages for intangible losses associated with its diminished reputation within the insurance community. The defendant has not raised this issue until now, the time of trial.  Under Pennsylvania law, Regis is entitled to recover for any actual harm it suffered to its reputation, intangible harm and special damages suffered as a result of the defamation.  This is reflected by the Pennsylvania Standard Civil Jury Instruction on damages in a defamation case. Pa. SSJI (CIV) 17.180.  That Instruction provides:

> The plaintiff is entitled to be fairly and adequately compensated for all harm it suffered as a result of the false and defamatory communication published by the defendant.
>
> A.      The injuries for which you may compensate the plaintiff by an award of damages against the defendant include:
>
> *First*, the actual harm to the plaintiff's reputation that you find resulted from the defendant's conduct;
>
> *Second*, the emotional distress, mental anguish, and humiliation that you find the plaintiff suffered as a result of the defendant's conduct
>
> *Third*, any other special injuries that you find the plaintiff suffered as a result of the defendant's act.
>
> B. If you find that the defendant acted either intentionally or recklessly in publishing the false and defamatory communication, you may presume that the plaintiff suffered both injury to its reputation and the emotional distress, mental anguish, and humiliation that would result from such a communication. This

---

[6]      Again, this is conjecture, as Regis did not have an opportunity to review Best's position before this Trial Brief was created.  Regis reserves the right to respond to any point of law raised in Best's Trial Brief.  Indeed, until proposed points for charge were exchanged, Regis was unaware that A.M. Best did not believe that prevailing law of damages in Pennsylvania would not apply to this case.  A.M. Best did not provide any authority for this position in advance of filing its Trial Brief.

means you need not have proof that the plaintiff suffered emotional distress, mental anguish, and humiliation in order to award it damages for such harm because such harm is presumed by the law when a defendant publishes a false and defamatory communication with the knowledge that it is false or in reckless disregard of whether it is true or false.

In determining the amount of an award for such presumed injury to the plaintiff's reputation and suffering of emotional distress, mental anguish, and humiliation by the plaintiff, you may consider the character and previous general standing and reputation of the plaintiff in its' community. You may also consider the character of the defamatory communication that the defendant published, its area of dissemination, and the extent and duration of the publication. You may also take into account the defendant's unsuccessful assertion of the substantial truth of the defamatory communications as a matter likely to affect the plaintiff's reputation. You may also consider what probable effect the defendant's conduct had on the plaintiff's trade, business, or profession, and the harm that may have been sustained by the plaintiff as a result of that conduct.

The motive and purpose of the defendant, its' belief or knowledge of the falsity of the publication, and the conduct of the plaintiff are not to be considered by you in determining the amount of the damages to which the plaintiff is entitled for the above-stated items. Such factors are only important to the question of whether you will award punitive damages against the defendant and if you choose to make such an award, the amount of the award.

Pa. SSJI (Civ) 17.180

The subcommittee note associated with the standard instruction notes that it is based on the Restatement of Torts Sections 621-623 (1938), which were specifically approved by the Pennsylvania Supreme Court in *Corabi v. Curtis Publishing Co.,* 273 A.2d 899, 919 (Pa. 1971).

It is believed that A.M. Best intends to raise the question of whether Regis, as a commercial entity, is entitled to collect damages from such intangible harm as humiliation, fear, and the other intangible aspects of a loss of reputation. Indeed, Regis is entitled to recover such damages. A recent Pennsylvania Court of Common Pleas decision refused did not dismiss as a matter of law a business plaintiff's claim for damages arising out of injury to its reputation or

loss of standing in the community. *Lilac Meadows, Inc. v. Rivello*, 25 Pa. D. & C. 5th 250, 267-68 (Lacka. Co. 2012). This suggests that assuming appropriate evidence is supplied, a business entity plaintiff is legally able to recover for such losses. A thorough search of Pennsylvania law and applicable Third Circuit law has yielded no case which specifically prohibits such recovery. Therefore, Regis Insurance Company asks the Court to permit it to recover for any damage it can prove consistent with Pennsylvania law, and as detailed in the Pennsylvania Standard Civil Jury Instruction, 17. 180. There is no reason to depart from settled, applicable Pennsylvania law.

> Respectfully submitted:
>
> **HAINES & ASSOCIATES**
>
> */s/ Clifford E. Haines*
> CLIFFORD E. HAINES (PA 09882)
> DANIELLE M. WEISS (PA 201067)
> Haines & Associates
> 1835 Market Street
> Suite 2420
> Philadelphia, PA 19103
> (215) 246-2200 (phone)
> (215) 246-2211 (fax)
> *Attorneys for Plaintiff Regis Ins. Co.*

Dated: May 15, 2013

## <u>CERTICATE OF SERVICE</u>

I, Danielle M. Weiss, Esquire, hereby certify that on or about this 15th day of May, 2013, a true and correct copy of the foregoing *Plaintiff's Trial Brief* was filed via the E-Filing System and will be served upon the following party electronically, via the Court's electronic filing system, in accordance with Pa. R.C.P. 205.4(g) and will be served electronically on all counsel.

*/s/ Danielle M. Weiss*
DANIELLE M. WEISS  (PA 201067)
Email: dweiss@haines-law.com
Haines & Associates
1835 Market Street - Suite 2420
Philadelphia, PA 19103
Telephone:  215-246-2200
Fax:    215-246-2211
*Attorney for Plaintiff*

17