**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **REGIS INSURANCE COMPANY,** | : | |
| | : | |
| **Plaintiff,** | : | |
| **v.** | : | **CIVIL ACTION** |
| | : | |
| **A.M. BEST COMPANY, INC.,** | : | **NO. 10-3171** |
| | : | |
| **Defendant.** | : | |
| | : | |
| | : | |
| | : | |

<u>**MEMORANDUM OPINION**</u>

Tucker, C. J.                                                                                          May 20, 2014

        Plaintiff Regis Insurance Company ("Regis") brought this civil action against Defendant

A.M. Best Company, Inc. ("A.M. Best" or "Best") for damages it allegedly suffered as a result of

A.M. Best's downgrade of Regis' credit rating in early 2010.  This matter proceeded to trial on

May 20, 2013.  After six days of Regis presenting its case in chief to the jury, A.M. Best moved

for judgment as a matter of law pursuant to Fed. R. Civ. P. 50(a).  The Court granted the motion.

Regis has now filed the instant Motion for New Trial pursuant to Fed. R. Civ. P. 59.  Upon

consideration of Regis' motion, all responses thereto, and following oral argument, Regis'

motion will be denied.

### I.  <u>FACTUAL AND PROCEDURAL BACKGROUND</u>

        The highly technical facts of this case were fully set forth in the Court's March 1, 2013

Memorandum Opinion. <u>Regis Ins. Co. v. A.M. Best Co., Inc.</u>, CIV.A. 10-3171, 2013 WL

775521 (E.D. Pa. Mar. 1, 2013).  Regis's Complaint alleged five counts against A.M. Best: (1)

declaratory judgment, (2) defamation, (3) commercial disparagement, (4) tortious interference

1

with contractual relations, and (5) tortious interference with prospective contractual relations. Regis voluntarily withdrew its claim for a declaratory judgment.  In the March 1, 2013 Memorandum Opinion, the Court granted A.M. Best's Motion for Summary Judgment as to both of Regis' tortious interference claims.  However, the Court denied the Motion for Summary Judgment as to Regis' defamation and commercial disparagement claims.  Subsequently, on March 13, 2013, Best filed a Motion for Certification for Interlocutory Appeal.  On April 19, 2013, the Court entered an Order denying A.M. Best's Motion for Certification. (ECF No. 60) ("April 19, 2013 Order").

This matter proceeded to trial on May 20, 2013.  After six days of Regis presenting its case in chief to the jury, A.M. Best moved for judgment as a matter of law pursuant to Fed. R. Civ. P. 50(a).  The Court granted A.M.'s Best motion, stating the following:

> In considering the Rule 50 Motion, the Court is of the opinion that there is some issue as to whether or not there is sufficient evidence and I have to take the rating separate from the press release.
>
> As to the rating, the Court is of the opinion that this is…a situation of an opinion about which reasonable persons can differ, and I don't find it a matter of false statements.   But even assuming that the statements were false, the **Court finds no evidence of reckless disregard or actual malice, which is necessary in order to proceed.**
>
> As it relates to the press release, the Court is of the same opinion that while the statements may have been changed, the substance of the press release was the same, and **the change was not so material that it entered into the area of actual malice**.
>
> So accordingly, **this Court finds that the evidence is insufficient on defamation and commercial disparagement as it relates to the rating and the press release for the claims to go to the jury**. And accordingly, the Court grants the Rule 50(a) motion in this matter.

(Tr. Rule 50(a) Mot. Ruling 2:2-3:1, May 28, 2013) (emphasis added).  The instant Motion for New Trial challenges the Court's ruling granting A.M. Best's Rule 50(a) Motion.

## II.  STANDARDS OF REVIEW

### A.  Motion for Judgment as a Matter of Law

Federal Rule of Civil Procedure 50 governs a motion for judgment as a matter of law ("JMOL").  A district court may grant JMOL only if "a reasonable jury would not have a legally sufficient evidentiary basis to find for [a] party." Fed. R. Civ. P. 50(a)(1).  Further, JMOL is appropriate only where, "viewing the evidence in the light most favorable to the non-movant and giving it the advantage of every fair and reasonable inference, there is insufficient evidence from which a jury could reasonably find liability." Warren v. Reading Sch. Dist., 278 F.3d 163, 168 (3d Cir. 2002); see also Walter v. Holiday Inns, Inc., 985 F.2d 1232, 1238 (3d Cir. 1993) ("The question is not whether there is literally no evidence supporting the party against whom the motion is directed but whether there is evidence upon which the jury could properly find a verdict for that party.") (quoting Patzig v. O'Neil, 577 F.2d 841, 846 (3d Cir.1978)).

### B.  Motion for New Trial

Federal Rule of Civil Procedure 59 governs a motion for a new trial.  A court may grant a new trial after a jury trial "for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed.R.Civ.P. 59(a).  A court may grant a new trial on the grounds of: (1) improper admission or exclusion of evidence; (2) improper instructions to the jury; (3) newly discovered evidence exists that would likely have altered the outcome of the trial; (4) improper conduct by an attorney or the court unfairly influenced the verdict; (5) the jury's verdict is against the clear weight of the evidence; or (6) the verdict is so grossly excessive or

inadequate as to shock the conscience.  See Goodman v. Pennsylvania Tpk. Comm'n, 293 F.3d

655, 676 (3d Cir. 2002) (citing Becker v. ARCO Chem. Co., 207 F.3d 176, 180 (3d Cir.2000));

Am. Bd. of Internal Med. v. Von Muller, 10-CV-2680, 2012 WL 2740852 (E.D. Pa. July 9,

2012); Suarez v. Mattingly, 212 F. Supp. 2d 350, 352 (D.N.J. 2002); Davis v. Gen. Acc. Ins. Co.

of Am., 153 F. Supp. 2d 598, 599-600 (E.D. Pa. 2001); Griffiths v. Cigna Corp., 857 F.Supp.

399, 410–11 (E.D.Pa.1994), aff'd, 60 F.3d 814 (3d Cir.1995) (unpublished table decision).  The

overriding principle is that a court has the power and duty to order a new trial to prevent

injustice.  11 Charles Alan Wright et al., Federal Practice and Procedure § 2805 (2d ed.1995).

Determining whether to grant a new trial is within the "sound discretion of the trial court." Allied

Chemical Corp. v. Daiflon, Inc., 449 U.S. 33, 36, 101 S.Ct. 188, 191, 66 L.Ed.2d 193 (1980);

Wagner v. Fair Acres Geriatric Center, 49 F.3d 1002, 1017 (3d Cir.1995).

　　　　The standard that a district court is to apply when ruling on a motion for a new trial

differs with the grounds asserted in support of the motion. Lind v. Schenley Industries Inc., 278

F.2d 79, 89 (3d Cir.1960). The district court has broad discretion when the asserted ground for a

new trial is a ruling on a matter that initially rested within the discretion of the court, such as an

evidentiary ruling or jury instruction. Klein v. Hollings, 992 F.2d 1285, 1289–90 (3d Cir.1993);

Lind, 278 F.2d at 90; Farra v. Stanley–Bostitch, Inc., 838 F.Supp. 1020, 1026 (E.D.Pa.1993).

Where the motion for a new trial is based on an assertion of legal error, the court conducts a two-

step analysis.  First, the court determines whether it erred at trial.  Second, the court determines

"whether that error was so prejudicial that refusal to grant a new trial would be 'inconsistent with

substantial justice.'" Farra, 838 F.Supp. at 1026 (quoting Bhaya v. Westinghouse Elec. Corp.,

709 F.Supp. 600, 601 (E.D.Pa.1989) (quoting Fed.R.Civ.P. 61)).

4

### III.  <u>DISCUSSION</u>

In the instant matter, the only argument Regis advances in its Motion for New Trial is that the Court's decision to grant A.M. Best's Rule 50 motion was "wholly inconsistent with prior rulings" in this case. (Pl.'s Reply in Supp. 2; <u>see</u> <u>also</u> Pl.'s Mot. New Trial 2) ("The Court's decision that A.M. Best was entitled to judgment as a matter of law was particularly curious given the procedural history of this matter.")  Regis asserts that the Court outlined various genuine issues of material fact in both its March 1, 2013 Memorandum Opinion denying in part Best's Motion for Summary Judgment, and it's April 19, 2013 Order denying A.M. Best's Motion for Interlocutory Appeal.  Yet, Regis argues, the Court ultimately deprived Regis of the right to have a jury determine these genuine issues of material fact.  Regis contends that the evidence it presented at trial (in particular it's Exhibit 41) was substantially similar to — if not greater than— the evidence it presented in opposition to Best's prior summary judgment and interlocutory appeal motions.  (Pl.'s Reply in Supp. 2; Tr. Oral Argument 5:2-14, Oct. 9, 2013.) Thus, Regis concludes, "[i]f the record on summary judgment and the record presented at trial are substantially similar, then the only way the Court could rule in favor of A.M. Best at the close of…Regis' case was to engage in impermissible fact-finding." (Pl.'s Reply in Supp. 2.) Accordingly, Regis claims that it was improper for the Court to supplant its own judgment for that of the jury.

### A.  The Court's March 1, 2013 Memorandum Opinion and April 19, 2013 Order

The Court will begin its analysis by noting that, problematically, Regis' theory of liability in this matter has been something of a moving target that has been difficult to pin down. (<u>See</u> e.g., Tr. Oral Argument 13:5-24.)  Up until the summary judgment stage, it was Regis' position

that both A.M. Best's downgraded credit rating of Regis and the press release A.M. Best issued

announcing that downgrade were capable of defamatory meaning.  Likewise, A.M. Best's

Motion for Summary Judgment also seemed to conflate the two.  The Court, however, has

endeavored to stress that there is a vital distinction that must be drawn between the rating itself

and the press release.  As the March 1, 2013 Memorandum Opinion stated:

> The Court finds it necessary at this juncture to distinguish between
> the two interrelated communications/statements that are at issue in
> this case: (1) the rating itself and (2) Best's press release, which is
> a reflection of the rating. **A rating, standing alone, is an opinion,
> as Best adamantly avers. A rating, unless patently baseless, has
> no inherent truth; it is merely an estimation, arrived at
> through application of Best's methodologies, of the financial
> health of the rated organization. But in order for Best's
> "ratings opinion" to be entitled to the protection generally
> afforded to opinions in defamation actions, Best's
> methodologies must have actually been followed.** Here, there
> remains a genuine issue of material fact as to whether Best
> followed its own methodologies in this particular instance.

Regis Ins. Co., 2013 WL 775521, at *10 (emphasis added); see also id. at n. 13 ("The Court also

rejects any assertion by Regis that Best should have not downgraded it at all."); id. at *6-9, 11

(discussing the arguable deficiencies in the language of the press release).  Thus the Court has

emphasized two things: (1) for the reasons outlined, there were genuine issues of material fact as

to whether the press release was capable of defamatory meaning, and (2) the rating itself could

be capable of defamatory meaning *only if* A.M. Best did not follow its own methodologies in

reaching its ratings decision.

A.M Best's Motion for Certification for Interlocutory Appeal essentially sought

reconsideration of the Court's March 1, 2013 Memorandum Opinion.  In denying the motion, the

Court's April 19, 2013 Order sought to clarify what had apparently been left unclear in the

March 1, 2013 Memorandum Opinion.  Accordingly, the Court stated:

6

> **As Best pointed out in its briefs in support of summary judgment, it at times appears to be Regis' position that Best was not entitled to downgrade it at all. To the extent this is Regis' argument, this Court, like the Sixth Circuit in** <u>Compuware Corp. v. Moody's Investors Servs.</u>**, Inc., 499 F.3d 520 (6th Cir. 2007), has emphatically rejected this assertion….But as the Court stated in its [March 1, 2013 Memorandum] Opinion, a distinction must be drawn between the rating itself and how that rating (and the reasons for it) was communicated to the public**….Best has made much of the fact that the Court's Opinion states that Best's ratings process "appears to have been democratic and collaborative, and the Court does not believe that Best made the decision to downgrade Regis lightly."….Practically speaking, however, it matters little how democratic the ratings process was if the end result (the press release) is not as carefully considered as the ratings process itself. The public is not privy to the ratings process; all the public is privy to is the ultimate ratings decision, as communicated in the press release. **The Court's Opinion focuses heavily on the wording of the press release because defamation requires publication and the press release is the only publication at issue.**

(ECF No. 60 at 2-3) (internal citations omitted; emphasis added). The Court further stated:

> **At bottom, the viability of Regis' defamation and commercial disparagement claims come[s] down to this single question: whether Best properly communicated to its audience the bases for its decision to downgrade Regis. The Court found that there is a genuine issue of material fact on this question. To be clear: the problem with the press release is that it arguably implies Regis experienced certain financial difficulties in 2009 when, in fact, it had not.** The only thing that had changed in 2009 was that Best learned of information about the financial health of Regis' parent company of which it was previously unaware. As detailed in the [March 1, 2013 Memorandum] Opinion… a reasonable jury could find that Best recklessly framed its rating and press release in such a way as to create the false impression that Regis experienced certain financial difficulties in 2009.

(<u>Id.</u> at 3) (internal citations omitted; emphasis added). The Court, therefore, attempted to focus

the parties' attention to the language of the press release, and again rejected Regis' broad

assertion that A.M. Best was not entitled to downgrade it at all.  Thus, on two occasions prior to

trial, the Court expressed doubt that the rating itself, if viewed in isolation, was defamatory.

### B.  Regis' Evidence at Trial[1]

At trial, however, Regis again returned to its insistence that both the downgraded credit

rating and the press release constituted defamation.  Over the course of six days the vast majority

of Regis' evidence was devoted to proving that the ratings downgrade itself was improper; Regis

only addressed the press release as an ancillary matter.  For instance, although opening

statements are not evidence, see Model Civ. Jury Instr. 3rd Cir. 1.12 (2011); Trial Tr. 25:18-22,

May 20, 2013, the arguments presented by Regis' counsel during opening arguments are

illustrative of how Regis sought to frame its case to the jury. Regis argued: "If an insurance

company loses its rating, it is the death knell for that company….nobody is going to dispute that

fact.  The marketplace in the world of insurance is, like it or not, driven by the rating." (Trial Tr.

33:19-23, May 20, 2013.)  Regis then argued:

> If you saw it when it was up on that screen, you will see again that
> the press release disclosed that in January of 2010, A.M. Best
> dropped Regis' rating to a B-minus.  **And that B-minus will in
> the very near future put Regis out of business.  And that's why
> we are here.**  We are here not only because that's the outcome, but
> we are here because we challenge the rating and we challenge what
> was said about Regis in that press release.

(Id. at 34:19-35:2) (emphasis added).  The Court will review the testimony of each of Regis'

witnesses in turn.

---

[1] The following is offered merely as a summary of the evidence the Court considered most relevant in rendering its
decision to grant A.M. Best's Rule 50 Motion.  Because it is only a summary, it is not intended to be a complete
reflection of all the evidence Regis presented over six days of testimony.

1.   <u>Testimony of Sharon Rinaldo</u>

Sharon Rinaldo is the Comptroller at Regis. In this capacity, Ms. Rinaldo attended the meeting in fall 2009 which began the process for Regis' 2010 rating and had subsequent communications with A.M. Best regarding Tiber.  Accordingly, Regis presented extensive testimony from Ms. Rinaldo about mechanics of A.M. Best's ratings process and her involvement in that process.

During this time, Regis repeatedly attempted to elicit testimony from Ms. Rinaldo that Regis' current financial troubles are directly attributable to the ratings downgrade.  The Court ruled that Ms. Rinaldo, a fact witness, was not qualified to provide this kind of expert testimony. (<u>Id.</u> at 27:7-28:11; Trial Tr. 21:11-24:1, 68:6-21, 69:13-70:7, 71:14-73:22, May 21, 2013.)  The Court notes that Regis is not challenging that evidentiary ruling in the instant motion.

2.   <u>Testimony of Marc Liebowitz</u>

Regis next called Marc Liebowitz to testify.  Mr. Liebowitz was the A.M. Best junior analyst responsible for analyzing Regis in preparation for its 2010 rating.  Mr. Liebowitz had been assigned to the Regis account since 2006.  Mr. Liebowitz testified extensively to the mechanics of the ratings process from A.M. Best's perspective, and thus served to complement the testimony previously given by Ms. Rinaldo.

The first and second days of Mr. Liebowitz's testimony were apparently primarily intended to establish that A.M. Best and the service it provides is highly regarded in the marketplace, and consequently a lowered rating can have a damaging effect on a rated entity's ability to do business.  The following is representative of Regis' line of questioning:

**Q. Mr. Liebowitz, you are aware of the fact, are you not, that Best['s] rating drives the market? You know that, right?**

A. It drives the market?

Q. It drives the market?

A. That's a broad statement again. It's certainly one of the aspects that would likely go into an—for a company to purchase insurance or for a broker to recommend.  I could say it's certainly one of the driving or one of the forces that people would look to, perhaps.

Q. I want to go back to the statement that I quoted to you.  ["]You are the largest and longest-established company devoted to issuing in-depth reports and financial strength ratings about insurance organizations.["]  You certainly are the largest, correct?

A. I mean, there are certainly other companies that do credit ratings for insurance companies….[W]e could certainly be the largest, but there are certainly other companies that provide credit ratings for insurance.

Q.  And those are who?

A. S&P, Moody's, Fitch…

Q. Well, of all of those companies that you have identified, only one of them is devoted to insurance, correct….Everyone else rates all kinds of other things, right?

A.  Yeah….I just want to make sure the point is that they do offer ratings for insurance companies….

[…]

Q. Mr. Liebowitz, you are not a potted plant either.  You understand the world of insurance and you understand the market of rating insurance companies. You can't really disagree with me, can you—

A. I can't.

Q. —that **Best's rating is *it*** when it comes to rating insurance companies, correct?

10

(Trial Tr. 13:8-15:23, May 21, 2013) (emphasis added).

Having established these purely background facts, Regis then interrupted Mr. Liebowitz's testimony to call Stephen Johnson to the stand.  After Mr. Johnson testified, see section III.B.3, infra, Mr. Liebowitz then retook the stand, during which time Regis extensively questioned him about the history of the relationship between Regis and A.M. Best; Regis' past ratings history; Mr. Liebowitz's contact with Regis during the 2010 ratings process; and Regis' appeal from the ratings process.  Regis' questioning of Mr. Liebowitz eventually got around to the 2010 press release, and what information Mr. Liebowitz used in constructing its language. (Trial Tr. 159:1, May 22, 2013.)  This then led to a discussion of why Mr. Liebowitz recommended to his superiors at Best, on January 8, 2010, that Regis should maintain its B+ rating. (Id. at 161:8.)

The Court surmises from this line of questioning that Regis sought to establish that nothing had changed at Regis at the time of the January 2010 downgrade—as evidenced by the fact that (1) Mr. Liebowitz did not recommend downgrading Regis and (2) Mr. Liebowitz used the same language in recommending that Regis remain at a B+ as he had when prior B+ ratings decisions had been issued in previous years. (See id. at 183:9.)  Regis further sought to establish that "the downgrade of Regis Insurance Company was predicated on Tiber Holding Company and nothing about Regis as a stand-alone entity." (Id. at 187:4-7). Mr. Liebowitz refuted this assertion. (Id. at 187:8-188:4.) There then ensued an extended discussion in which Regis attempted to argue that it was improper for Best to consider the financial condition of Tiber in calculating Regis' credit rating— i.e., to allow Tiber to "drag down" Regis' rating. [2] (Id. at 188:5-207:11.)

---

[2] The following question by Regis' counsel is fairly typical of this exchange:

Ultimately, on redirect, Mr. Liebowitz provided testimony concerning an internal A.M. Best draft press release (Exhibit 41).  This draft press release was not published or seen by anyone outside of A.M. Best.[3] (Id. at 33:9-35:17.) This initial version of press release stated the following:

> The recently received (by A.M. Best) audited financial statements of Tiber indicate potentially significant exposure to Regis should certain of Tiber's litigation-related liabilities be enforced.   It should be noted that Tiber's litigation-related liabilities are not related to Regis, which is under the regulatory jurisdiction of the Pennsylvania Department of Insurance.

(Pl.'s Trial Ex. 41; see also Pl.'s Mot. New Trial, Ex. A.)  Mr. Liebowitz testified that either he or Gerard Altonji wrote this language, and Matthew Mosher, an A.M. Best senior executive, deleted it. (Trial Tr. 35:9-17, May 22, 2013.)

### 3.   Testimony of Stephen Johnson

Mr. Johnson is a Deputy Commissioner for the Pennsylvania Department of Insurance ("DOI"), and is in charge of corporate and financial regulation. Mr. Johnson, from his perspective as a regulatory authority, testified to his opinion of Regis' financial health.  Mr. Johnson, at the behest of Regis, became involved in the 2009-2010 ratings process. He had several phone calls with A.M. Best's analysts, Mr. Liebowitz and Mr. Altonji, to "confirm" that Pennsylvania would not allow the New York Liquidator to seize Regis in order to satisfy Tiber's

---

> Q. Mr. Helstrom told you Tiber has nothing to do with Regis.  Mr. DiLoreto said Tiber has nothing to do with Regis.  The insurance regulat[or], Department of Insurance of the Commonwealth of Pennsylvania said Tiber has nothing to do with Regis.  Best ignored all that evidence.

(Trial Tr. 202:6-13, May 22, 2013.)

[3] Because this draft press release was not published or seen by anyone outside of A.M. Best, it is not a "communication" for purposes of defamation.  The Court however, over the objection of A.M. Best, (see id. at 32:24-33:19), permitted Regis to question Mr. Liebowitz about this draft press release because it was relevant to the question of what language Regis chose to use or not use in crafting the language of the press release that was published.

debts.  After Best made the final decision to downgrade Regis, Johnson had also written a letter

to Best in which he urged Best to reconsider downgrading Regis.

      In addition, Regis also attempted to elicit testimony from Mr. Johnson regarding what

effect the downgrade had had on Regis' business.  As the Court ruled at trial, Mr. Johnson was

not proffered as an expert witness and therefore was not qualified to offer this kind of expert

opinion testimony. (Id. at 4:3-18:8, 113:1-115:1.)  The Court again notes that Regis is not

challenging that evidentiary ruling.

                4.  Testimony of Earl Helstrom

      Regis next called Earl Helstrom, Regis' outside accountant during this time period, to

testify.  Like Ms. Rinaldo, Mr. Helstrom could only provide background information concerning

A.M. Best's ratings process and his involvement in that process.  Mr. Helstrom indicated that he

was the accountant for all of Richard DiLoreto's companies, and had become involved in the

2009 ratings process at Mr. DiLoreto's request.  Helstrom testified that he had conversations and

exchanged emails with Mr. Liebowitz and Mr. Altonji in which he expressed his belief that

Regis "need[ed] to be viewed as a stand-alone company for legal reasons and is insulated from"

Mr. DiLoreto's other companies (Trial Tr. 47:5-7, May 23, 2013.)  Mr. Helstrom then went on to

provide extensive testimony regarding why, in his opinion, Regis should be viewed as a distinct

entity, and that nothing about Tiber should have been taken into account in rating Regis. (Id. at

47:15-103:14.)  Over A.M. Best's objection, the Court then permitted Mr. Helstrom to testify

regarding what affect the downgrade allegedly had on Regis from a financial perspective. (Id. at

103:15-106:22.)

In summary, the gist of Mr. Helstom testimony was that A.M. Best should consider Tiber's financial condition in rating Regis but, if it did so, it should reach the conclusion that Tiber's financial condition had "no impact whatsoever on Regis." (<u>Id.</u> at 149:1-150:10.)  On cross examination, Mr. Helstrom summarized his opinion as follows:

> Q.      Okay.  Does the first part that I referred to, the top-down analysis includes the exposure to risk generated by activities that the parent holding company.  Doesn't that refer to Tiber?
>
> A.      That's the parent holding company and that is the debt of the New York Liquidator and which you can't get to the insurance company and that's the debt of the bonds that are not going to be paid.  Neither—that does not go down to Regis either.  So Regis really has no connection to the debt that is on the Tiber-corporation level.
>
> Q.      Whether that's true or not remains to be decided.  But it's your analysis that the liabilities of Tiber will never be visited on Regis, correct?
>
> A.      That's correct.
>
> Q.      **And that's the kind of dispute, the difference of opinion that you have with the people at A.M. Best in rating Regis, whether the A.M. Best people were correct that they should consider those liabilities that Tiber had in rating Regis, or whether they shouldn't.  Doesn't that sum up what your difference of opinion is?**
>
> A.      Not totally.
>
> Q.      No? What did I miss?
>
> A.      **Well, I think when A.M. Best came in to study this thing, they didn't understand it, so they should have put a U [for "under review"] on the rating…and then just moved on until they fully understood it.**

(<u>Id.</u> at 154:1-155:8) (emphasis added).

14

5.   Testimony of Karen Standen

Regis next called Karen Standen, an insurance underwriter for Regis, to testify; Ms. Standen sells brokers insurance at Regis.  Over the objection of A.M. Best, the Court permitted Ms. Standen to testify that since the 2010 downgrade Regis' ability to garner new business and renew policies has declined. (Id. at 193:4-194:8.) This was the full extent of Ms. Standen's testimony on direct examination, and she was not cross-examined by Best.

6.   Testimony of Gerard Altonji

Regis then called Gerard Altonji, Mr. Liebowitz's supervisor, to testify. Mr. Altonji was the senior A.M. Best employee in charge of analyzing Regis in preparation for its 2010 Rating.  Mr. Altonji, like Mr. Liebowitz, testified regarding Best's ratings methodologies. Mr. Altonji, like Mr. Liebowitz, testified that Best had requested the consolidated financial statements of Regis prior to 2009, but that none had ever been provided.  Mr. Altonji further testified that Mr. DiLoreto had repeatedly represented to Best in the past that Tiber had "no debt."  In light of the revelations of late 2009, Mr. Altonji came to believe that Mr. DiLoreto had misrepresented Tiber's financial condition to A.M. Best; Mr. Altonji further testified that, in his opinion, Mr. DiLoreto had a history of being less than truthful with A.M. Best, and provided background to that effect.

The following day, Mr. Altonji testified as to the information he and Mr. Liebowitz provided to the ratings committee, and how the ratings committee's process works.  Mr. Altonji again confirmed that that he and Mr. Liebowitz recommended to the ratings committee that Regis maintain its B+ rating.  In addition, while questioning Mr. Altonji, Regis again sought to emphasize that A.M. and the service it provides is highly regarded and that a lowered rating

15

would have damaging effect on a rated entity's ability to do business — just as Regis had

emphasized while questioning Mr. Liebowitz. The following is representative of Regis' line of

questioning:

> Q. Now, yesterday, I think, Mr. Liebowitz was asked about whether or not…the impact of the rating is taken into consideration. And he said absolutely not, you are not permitted to [take that into consideration].  Is that right?
>
> A. That's what he said.
>
> Q.  You don't disagree with that, do you?
>
> A. None of us disagree with that.
>
> Q. None of you meaning—
>
> A. A.M. Best.
>
> Q.  You are not speaking for company policy, right?
>
> A. Right.
>
> Q.  But although you don't—you are not permitted to take that into consideration, in point in fact, A.M. Best knows exactly what the consequence of its rating is, agree?
>
> A. No, I don't agree.
>
> Q.  Well—
>
> A.  We have an idea there may be an impact, but we don't know what the exact impact will be.
>
> **Q.  Well, Mr. Altonji, the whole promise of Best is that it's on top of the world of insurance, right?**
>
> A.  Okay.
>
> Q.  What do you mean okay?  Is that a yes or a no?
>
> A.  I will say yes.

16

Q. Okay.  I mean—

A. Okay.  Let's keep going.

Q.  **The theory is that A.M. Best knows insurance better than anybody else in the world.  That's kind of what you hold yourself out as being.**

A.  Okay, yes.

Q.  Okay, yes?

A.  Yes.

Q.  **Okay.  So you are not, like, unmindful of the fact that people buy insurance and people sell insurance and, in many instances, buyers and sellers of insurance rely on that rating?**

A.  Among other things, yes.  It's not the sole consideration when they buy insurance, but yes.

Q. Well, that suggests you do know something about it, because that suggests that were are other considerations that you know about.  You said among other things?

A. Is there a question?

Q. You said among other things?

A. Yes.

Q.  Do you know—let me ask you this question.  One of the reasons that you don't just publish a letter and a plus minus or whatever, and one of the reasons you provide substantive information, if you will, is to allow the reader to know what the basis for your rating is, correct?

A. Yes.

Q.  You want to give the reader a transparent picture of here is why we have rated this particular insurance company this way, correct?

A: Correct.

17

Q. Not what the speculation is, not what the world of possibilities is, but what are the facts, correct?

A. We look at the facts but we also consider, you know, possibilities, things that might happen in the future, could happen in the future.

Q. Well, you—

A. Because when you say facts, that would imply all we do is look at the latest financial statements, the numbers and going back. Obviously, those are facts, right. But we talk about the profile of the company and things that could affect it.

(Trial Tr. 6:15-10:6, May 24, 2013.) There then ensued a discussion of Best's methodology and what factors Best considers in calculating a rating. The clear purpose of this line of questioning was for Regis to critique the rating on the grounds that, in Regis' opinion, the judgments against Tiber were "not that big a deal" and that Tiber's financial condition should have no effect on Regis' rating. The following exchange is indicative:

Q. Okay. I am taking about as a general proposition. Putting aside now what everybody else has said—

A: Okay.

Q. —that a bare judgment against somebody does not have any meaning. It sounds like a big deal, but it does not have any meaning until some—

[…]

Q. Until somebody tries to execute it, correct?

A: Well, I didn't know that.

Q. You did not know that?

A: I assume that it's something that can be collected.

18

Q. I'm sorry?

A: It's a legal obligation so I assumed that at some point it would be collected?

Q. Well—

A: Or at least attempted to be collected.

Q. Well, did you understand that the existence of the judgment itself doesn't mean somebody has got to start writing checks?

A: No, I did not understand that.

(Id. at 17:13-18:17.) Additionally, Regis asked the following questions:

Q. …So in the analysis that A.M. Best conducts, it has to not just look at possibility, it has to look at realistic possibilities. What are the realistic possibilities. Agreed?

A. Okay.

**Q. Mr. Altonji, when you downgraded Regis Insurance Company based on the judgments against Tiber, you had no idea what the realistic possibilities were, did you?**

A. Did you just say that we downgraded Regis because of the— based on the judgments against Tiber?

Q. I did say that.

A. Okay. That's not why we downgraded Regis.

**Q. Okay. We have been talking about the downgrade. It's up to the jury to decide in the final analysis why you downgraded….**

(33:16-34:9) (emphasis added).

Regis again eventually got around to the question of the press release. Mr. Altonji

testified that Mr. Liebowitz drafted Exhibit 41, while Mr. Altonji edited the document, and Mr.

Mosher edited Mr. Altonji's edits. (Id. at 40:18-41:21.)  Mr. Altonji offered the following

testimony regarding Exhibit 41 and the final 2010 press release.

> Q. Okay. Let's look at Exhibit 41.  Now, if you will look at your e-mail [to Marc Liebowitz] that accompanies this document.  You said in the e-mail: ["]see Matt [Mosher]'s edits, accept all of them and send to AMB Corporation Communication with a request that we have it back tomorrow morning and use it as a basis for the rationale.  We will call Richard [DiLoreto] in the morning.["]
>
> […]
>
> Q. Okay.   You say: ["]Accept all [the changes] and send it to ABM.["] Is that because you believed that the edits better stated A.M. Best's rationale?
>
> **A. No. I said it because my boss's boss's boss came back with those edits and I would defer to his judgment.  If that's how he wanted it to look, then that's fine.**
>
> Q. Well, let me give you an example…[T]he way the press release went out, ["]these rating actions reflect recent disclosures of the lack of financial flexibility at Regis's privately held parent, Tiber Holding Company.["] Because it's read that way, it read: ["]The recent—the recently received by A.M. Best.["] Right?
>
> A. That's what it says, yes.
>
> Q. That's the truth, correct?
>
> A. Correct.
>
> Q. But somebody said no, we don't want to say ["]recently received["] by A.M. Best.  We want to say ["]these ratings actions reflect recent disclosures,["] leaving unclear where those recent disclosures came from.  Right?
>
> **A. Well, I think reasonable people can say it's clear or unclear.  To me, it's still clear,** these actions reflect the recent disclosures of lack of—
>
> Q. How about it I try this with you.  Can't we agree that if you had…published as you said in the press release before it was edited

down, ["]The recently received by A.M. Best audited financial statement of Tiber indicates potentially significant exposure to Regis should certain of Tiber's litigation-related liabilities be enforced.["] That's the story, isn't it?   And you all took it out. Why?

**A. Well, maybe you want to ask Matt Mosher that question.**

Q. Well, I'm asking you since you told—

**A. I did not take it out.  I have, you know, my opinions, but they're really not relevant.  Mr. Mosher is the one that took it out.**

Q. Well, did you go to Mr. Mosher and say, Mr. Mosher, I know you are my boss's boss's boss, but what we are saying here doesn't accurately reflect the truth.

A. No.  I didn't say that and I wouldn't say that.  And…I disagree with your comment that it does not accurately reflect the truth after the edits.  The rating actions reflect recent disclosures.  This press release is coming from A.M. Best.  I think a reasonable reader of it, especially readers of A.M. press releases, all right, would recognize that that means it's recently disclosed to A.M. Best.

Q. Mr. Altonji, there were no recent disclosures.  The fact that there was a judgment had been known since 2002.  It was on the record.

[…]

A ….[The judgments are] not in the public domain in the sense that it's been announced that there are these judgments out there. How do I look for something that I don't know exists?

[…]

Q. Well, if you want to, in fact, know for sure about Tiber, all you've got to do it ask.  Correct?

A. And we did ask.

Q. And you testimony is we asked Mr. Di Loreto and he didn't produce?

21

A. That is correct.

(Id. at 41:22-46:5.)

7.   Testimony of Michael Cohen

Regis' final witness was Michael Cohen, who gave expert testimony regarding the A.M.

Best ratings process, A.M. Best's ratings methodologies, and A.M. Best's alleged departure from

those methodologies.  Mr. Cohen had formerly been a vice president at A.M. Best.  Because Mr.

Cohen was offered as Regis' expert, his testimony warrants repeating at some length.

Q. Okay. So we are clear, did you look at…the methodologies that were employed in looking at Regis Insurance Company standing alone?

A. Repeat that, please.

Q. Sure. Did you look at the methodology that was employed in reviewing Regis Insurance Company as a stand-alone entity?

A. Yes, I did.

**Q. Did you have any criticism or do you have any criticism of the way in which the methodologies applied to or were used in rating Regis standing alone?**

**A. No, I did not.**

**Q. So your opinions have to do with the way in which A.M. Best approached the parent?**

**A. That is correct.**

Q. Would you explain to the jury…what your basis is for believing that A.M. Best failed to employ or utilize appropriate—its appropriate methodologies in analyzing the parent, Tiber Holding Company?

A. When they reviewed the financial statements of Tiber, which I believe you have seen, there is a—an obligation, a liability on their

22

balance sheet for a judgment held by the New York Liquidation Bureau, and that number has grown over time so that at the point where these financial statements were reviewed, which was as of year-end 2008, that number was something on the order of $43 million.

And the analysts saw that number and assumed that, one, since the holding company had a very negative net worth technically speaking, that this financial stress of the holding company would spill over and impact the operating company, Regis, in a very negative way.

**And where the methodology was not followed according to my opinion is that given the magnitude of this negative net worth, the analysts did not drill down into what is going on here and how can the situation that led to this in real-time business terms actually affect Regis.**

The number looked large, and you could draw an analogy to if your spouse had entered a large check or withdrawal in your checkbook, you open up the checkbook and say, this is a large number, what is behind this. And my—the analogy that I am drawing here is that this number was so large that it bore additional and intense scrutiny to really find out what is going on there, what is this judgment all about, what is the history of it, how likely is it to actually come to fruition, who are the players involved, what have you.

Mr. Altonji noted on Friday that when he looked at it and his analytical colleagues looked at it that this was a very unusual situation that they hadn't seen before, and when I saw it, I said exactly the same thing.  I have never seen in my analytical career and my consulting career and my executive career as an insurance consultant, I have never seen situation like that either.

**And when you think about the methodologies, how does A.M. Best do its ratings, and these methodologies they put out are very well conceived,** and I am not saying that because I participated in many of them.  **I think they are very thoughtful documents as to how do we rate companies, what is an intelligent way to analyze companies, and they are well conceived.**
But to be able to explain—and you have also seen examples of press releases where a rating agency, and they all do this, it's here is why we are assigning—making a rating and assignment and here is why, and to dig down into complicated situations and explain [it to] the public is very important.

[…]

23

Q. Well, Mr. Cohen, didn't they in fact, quote, to use your phrase, drill down by contacting the Pennsylvania Department of Insurance and trying to find out what is going on here?

**A. They talked to the Pennsylvania Department of Insurance, but there were other entities that had pivotal roles in this that were more central to the disposition of how this particular judgment would play out.**

They asked the Deputy Commissioner of Pennsylvania, Mr. Johnson, who you met the other day…what position would they take in terms of how this judgment would play out, and he opined…to the analysts and opined to you and he said so in his deposition that this judgment would not have an impact on Regis.

So as the regulator for the companies domiciled, located in the state of Pennsylvania where his authority is, he opined that it would not have an impact on the financial strength and therefore the claims paying ability of Regis.

Q. In looking at an entity that is being rated by A.M. Best, is it a part of the methodology there to turn to the regulating authority in the jurisdiction where the insurance company exists to find out its position on issues?

A. Yes.

Q. …Did you see that in terms of drilling down A.M. Best also turn to Regis's and Tiber's accountant to try to get some understanding of what was going on here?

A. They did.

Q. Well, again, doesn't that constitute satisfying their methodology by doing this drill down that you have described?

**A. It does not…Talking to their accountant, Mr. Helstrom, he works for Regis and he is a competent accounting professional, but he is not a rating analyst, so he is providing his opinion, but his opinion is that of a layperson and it is not legally binding.  I mean, that's his judgment….**

Mr. Helstrom is a very competent C.P.A., but that does not certify him to be rating expert any more than me being a rating expert certifies me to be an accounting expert….

24

Q. In order to understand…in this particular case—

A: Yes.

Q. — what it was that was, as you described it, really going on here, what in your opinion did A.M. Best fail to do?

**A. They needed to get a—as clear picture as possible connecting with the New York Liquidation Bureau, the holder of this judgment, what did it mean, what are you likely to do, what are your legal rights to enforce this judgment….And…the A.M. Best analysts needed to determine from direct contact with the New York Liquidation Bureau what does this judgment mean, what are you intentions, how will you pursue it, whatever they can seek to understand in and of itself, and particularly because this was a unique situation….**

[…]

Q. …[A]re you aware of anything that A.M. Best did to factually understand this situation other than the conversations that they had with...the Insurance Department of Pennsylvania, and Mr. Helstrom and Mr. DiLoreto?

A. I am aware of those three contacts and not any others.

Q. In your opinion, was that sufficient for them to make a judgment about the significance of the judgments and how they could affect Regis Insurance Company?

**A. It was not….I believe they had to hear from the New York Liquidation Bureau directly…what their plans were and get an understanding the best they could of what action there would be.**

(Trial Tr. 45:6-54:11, May 29, 2014) (emphasis added).  Mr. Cohen then went on to discuss the

harm the lowered rating had on Regis' business. (Id. at 60:3-62:4.) Mr. Cohen did not offer any

opinions on the press release itself in his expert report, and therefore was not permitted to do so

at trial. (Id. at 56:16-59:16.) The Court again notes that Regis is not challenging that evidentiary ruling.

Additionally, Mr. Cohen did not state in his expert report what he believed the proper rating for Regis should have been in 2010.  Mr. Cohen did, though, testify regarding what he believed the proper rating should have been at his deposition.  However, Mr. Cohen did not provide any information to Best about his analysis in reaching this conclusion, and subsequent discovery requests to Regis' counsel went unanswered.  Accordingly, the Court did not permit Mr. Cohen to testify to what he believed the correct rating for Regis should be.  (Trial Tr. 6:19-10:11, May 28, 2013.)  The Court again notes that Regis is not challenging that evidentiary ruling.

### C.  Regis' Evidence at Trial  was Insufficient to Prove Defamation and Commercial Disparagement, and therefore Judgment as a Matter of Law was Appropriate

A brief recap of the applicable law is in order.  As the parties are well aware, under Pennsylvania law a plaintiff in a defamation action has the burden of proving the following:

(1) The defamatory character of the communication.
(2) Its publication by the defendant.
(3) Its application to the plaintiff.
(4) The understanding by the recipient of its defamatory meaning.
(5) The understanding by the recipient of it as intended to be applied to the plaintiff.
(6) Special harm resulting to the plaintiff from its publication.
(7) Abuse of a conditionally privileged occasion.

42 Pa.C.S. § 8343(a). Once a plaintiff establishes these elements, the defendant has the burden of proving the following, when relevant to the claim:

(1) The truth of the defamatory communication.
(2) The privileged character of the occasion on which it was published.
(3) The character of the subject matter of defamatory comment as of public concern.

Id. at § 8343(b).  At summary judgment and at trial, A.M. Best primarily challenged the sufficiency of Regis' evidence with respect to two elements of a defamation action: (1) the defamatory character of the communication, and (2) abuse of a conditional privilege.

With respect to the first element, a communication or statement is defamatory "if it tends to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him" or "if it ascribes to another conduct, character or a condition that would adversely affect his fitness for the proper conduct of his proper business, trade or profession." Regis Ins. Co., 2013 WL 775521, at *5 (internal citations omitted).  Importantly, however, only statements of fact, rather than mere expressions of opinion, are actionable under Pennsylvania law. Id. (citing Moore v. Cobb–Nettleton, 889 A.2d 1262, 1267 (Pa.Super.Ct.2005) and Smith v. Sch. Dist. of Philadelphia, 112 F.Supp.2d 417, 429 (E.D.Pa.2000).  Accordingly, an opinion can only be defamatory if it may "reasonably be understood to imply the existence of undisclosed defamatory facts justifying the opinion." Id. (citing Remick v. Manfredy, 238 F.3d 248, 261 (3d Cir.2001) and Parano v. O'Connor, 433 Pa.Super. 570, 575, 641 A.2d 607, 609 (1994)).

Additionally, abuse of a conditional privilege is indicated when the publication: (1) is actuated by malice or negligence; (2) is made for a purpose other than that for which the privilege is given; (3) is made to a person not reasonably believed to be necessary for the accomplishment of the purpose of the privilege; or (4) includes defamatory matter not reasonably believed to be necessary for the accomplishment of the purpose. Id. at *11 (internal citation omitted).  Actual malice requires that the speaker acted with knowledge that a published

statement is false or that the speaker acted with reckless disregard for the truth or falsity of the statement. Id. (internal citations omitted).

Finally, under Pennsylvania law the requirements for proving commercial disparagement are substantially the same as the requirements for proving defamation. Id. ("The legal standards applicable to defamation claims—including those for determining the truth or falsity of statements—are appropriately applied in determining the sufficiency of [a] claim for commercial disparagement.) (quoting QVC, Inc. v. MJC Am., Ltd., CIV.A. 08–3830, 2011 WL 2843746 (E.D.Pa. July 18, 2011)).  Accordingly, in order to prevail on a claim for commercial disparagement, a plaintiff must show that the defendant published a statement about plaintiff's business to another, and: (1) the statement was false; (2) the publisher either intended the publication to cause pecuniary loss or reasonably should have recognized that publication would result in pecuniary loss; (3) pecuniary loss did in fact result; and, (4) the publisher either knew the statement was false or acted in reckless disregard of its truth or falsity. Id. (internal citations omitted).

Thus, in order for Regis to have prevailed on either its defamation or commercial disparagement claims against A.M. Best, it would have to prove a false statement was made by A.M. Best either in connection with the rating or in connection with the press release.  Regis failed on both accounts.

### 1.  The Rating

The Court again reminds Regis that it has repeatedly expressed skepticism that the downgraded rating itself was defamatory.  The Court's March 1, 2013 Memorandum Opinion, however, left open the possibility that the rating could be defamatory *if* Regis could prove A.M.

did not follow its own methodologies in arriving at the rating decision.  Regis' evidence in this regard was wholly insufficient.

Two of Regis' witnesses, Ms. Rinaldo and Ms. Standen, could only testify to damages allegedly resulting from the ratings downgrade.  See 42 Pa.C.S. § 8343(a)(7).  Mr. Helstrom and Mr. Cohen also provided some testimony as to damages.  Establishing damages, however, accomplishes little if you have not first proven liability.  Mr. Liebowitz and Mr. Altonji testified to A.M. Best's internal methodologies and process for reaching the ratings decision. This was largely background information.[4]

The primary purpose of Mr. Johnson's testimony was clearly to call into question Best's decision to downgrade Regis.  The Pennsylvania Department of Insurance is not a credit rating agency, however.  Further, as A.M. Best has long argued, it is questionable whether Mr. Johnson's personal opinion represents the opinion of the Pennsylvania Department of Insurance. But even if Mr. Johnson's opinion does represent the position of the Department of Insurance, it is debatable what the DOI's position would be if Mr. Johnson no longer held his position.  Still further, as Mr. Johnson conceded at trial, he is not in a position to demand that Best substitute its own opinion regarding Regis' financial health for his personal opinion regarding Regis' financial health. (Trial Tr. 2:10-8:3, May 22, 2013.)  Thus, the most Mr. Johnson could testify to was his own opinion that Regis should not have been downgraded.  This is plainly insufficient.  Mr. Johnson is entitled to his own opinion regarding whether Regis should have been downgraded; likewise, A.M. Best is entitled to take into consideration what effect a change in leadership at the DOI could have on the New York Liquidator's ability to collect on its judgments against Tiber,

---

[4] The fact that Mr. Liebowtiz and Mr. Altonji both initially recommended to the ratings committee that Regis maintain its B+ is irrelevant.  As analysts, it is their job to make recommendations but it is the ratings committee that makes the final decision whether to adopt that recommendation.

and therefore how much weight to give Mr. Johnson's opinion.  Further, Regis elicited no

testimony from Mr. Johnson regarding whether Best had followed its own methodologies in

reaching the ratings decision.

Similarly Mr. Helstrom testified that, in his opinion, Tiber's financial condition should

not have been factored into Regis' rating.  However, Mr. Helstom's testimony that A.M. Best did

not "understand" the judgments is purely speculative.  Mr. Helstrom is an accountant, not an

expert on A.M. Best's specific methodologies or the methodologies of *any* credit rating agency.

(Trial Tr. 111:25-113:20, May 23, 2013.)  Regis' own expert, Mr. Cohen, himself recognized as

much.  More importantly, Mr. Helstrom conceded that A.M. Best's methodologies permit it to

consider the financial condition of a holding company in ratings its subsidiary. (Id. at 149:1-

150:24.) It is merely Mr. Helstrom's opinion that once A.M. Best considered Tiber's financial

condition, it should have reached the conclusion that Tiber's financial condition had no impact

on Regis. (Id.)  That is not a failure by A.M. Best to "understand" the judgments; that is merely

Mr. Helstrom disagreeing with the conclusion A.M. Best reached.  Mr. Helstrom is entitled to his

opinion, just as A.M. Best is entitled to reach its own opinion regarding the judgments.

The only witness who testified that A.M. Best departed from its methodologies was Mr.

Cohen.  Mr. Cohen was only able to testify to the methodologies' *general* requirement that

Best's analysts take both a top-down and bottom-up approach in rating insurance companies.

What these approaches require in any given situation is obviously highly context-specific.  In

this particular context, Mr. Cohen understood this to mean that A.M. Best needed to "drill down"

into Tiber and the judgments by contacting the New York Liquidator directly.  **This was the**

**only flaw Mr. Cohen could identify**.  But even in identifying this supposed flaw, Mr. Cohen

admitted that there could be a risk to Regis if A.M. Best were to contact the New York

Liquidator — although Mr. Cohen believed that risk was remote. (Trial Tr., 88:10-93:16, May

28, 2013.) But although Mr. Cohen considered the risk to be remote, he nonetheless

acknowledged that the New York Insurance Department had actively taken certain legal steps to

enforce the judgments.  **Mr. Cohen also acknowledged that no one at Regis ever asked**

**anyone at A.M. Best to contact the judgment holder.** (Id. at 85:14-97:18.)

Thus, the gist of Mr. Cohen's expert opinion is that A.M. Best lacked sufficient

information to rate Regis because it did not contact the New York Liquidator directly. (Id. 97:19-

99:1.) However, it is entirely speculative what, if anything, contacting the Liquidator would have

revealed or whether it would have altered A.M. Best's decision to downgrade Regis.  Even if

A.M. Best had contacted the Liquidator (and thereby, according to Mr. Cohen, fulfilled all its

duties under its methodologies), A.M. Best would still have been entitled to draw its own

conclusions regarding how much weight to give the judgments against Tiber.  **Thus, although**

**Mr. Cohen's expert opinion is couched in the language of disputing that A.M. Best followed**

**its methodologies, in reality Mr. Cohen is only disagreeing with the opinion that A.M. Best**

**ultimately formed**.  Mr. Cohen is entitled to his own opinion regarding what the judgments

mean, just as A.M. Best is entitled to form its own opinion regarding the judgments.  Indeed, Mr.

Cohen himself agreed that a rating opinion is something about which reasonable people can

differ. (Id. at 66:13-22; 112:13-17.)  Mr. Cohen further agreed that there is a "great deal of

judgment and discretion that has to be exercised by the analyst in trying to understand what

impact the parent will have on the operating insurance company." (Id. at 112:4-12.)  Mr. Cohen

also agreed that in some circumstances the financial condition of a holding company could be so

weak that its weakness should have bearing on its subsidiary's rating. (Id. at 68:2-69:23.) More specifically, Mr. Cohen also agreed it was proper for A.M. Best to consider the financial condition of Tiber in rating Regis. (Id. at 70:3-18.)  Finally, when asked to identify a *specific* provision in Best's policy that required it to contact the New York Liquidator, Mr. Cohen could not. (Id. at 107:12-112:25.)  Mr. Cohen also could not identify a single instance in which a credit rating agency had contacted a judgment creditor about what its intentions were in trying to collect on its judgments against either an insurance company or its parent company. (Id.)

In sum, Regis presented no competent evidence that A.M. Best departed from its methodologies in rating Regis.  As such there was no evidence from which a jury could conclude that the rating was anything other than an opinion, about which reasonable people could disagree.[5]  Because the rating is an opinion, it cannot be false and cannot serve as a basis for a defamation or a commercial disparagement claim. (See Tr. Rule 50(a) Mot. Ruling 2:2-14, May 28, 2013) ("As to the rating, the Court is of the opinion that this is…a situation of an opinion about which reasonable persons can differ, and I don't find it a matter of false statements.   But even assuming that the statements were false, the Court finds no evidence of reckless disregard or actual malice, which is necessary in order to proceed.")

Accordingly, the Court's Rule 50(a) ruling with respect to the rating was neither inconsistent with its March 1, 2013 Memorandum Opinion and April 19, 2013 Order, nor impermissible fact-finding. Curiously, Regis now appears to concede that a rating is an opinion

---

[5] Additionally, there was no support for Regis' previous contention that A.M. Best downgraded Regis as some kind of retribution for Mr. DiLoreto's perceived misrepresentations of Tiber's financial condition. (See Pl.'s Resp. Opp'n Mot. Summ J. n. 1, 5-6.)  Thus, the fact that Mr. Altonji admittedly accused Mr. DiLoreto of being a "liar" is irrelevant — especially considering that even after this episode Mr. Altonji still recommended to the ratings committee that Regis maintain its B+ rating.

and cannot form the basis for a defamation or commercial disparagement claim.  At oral

argument, Regis asserted the following:

> The issue was not recklessness with respect to A.M. Best'[s] decision making, although
> we contended that they had breached their own guidelines with respect to how they
> addressed the issue, the rating. The issue was reckless as it related to the press release.

(Tr. Oral Argument 4:1-6.)  This belated realization, however, runs contrary to the vast majority

of the evidence Regis presented at trial. (See id. at 11:3-16.)

### 2.  The Press Release

Both the Court's March 1, 2013 Memorandum Opinion and April 19, 2013 Order

discussed potential deficiencies in A.M. Best's 2010 press release announcing the ratings

downgrade.  At summary judgment, Regis identified four statements in Best's January 12, 2010

press release which it claimed were capable of defamatory meaning. Specifically, the press

release stated the following: Regis was being downgraded due to "the *recent* disclosure of the

lack of financial flexibility at Regis' privately held parent, Tiber Holding Corporation

(Wilmington, DE), due to that organization's high consolidated financial leverage, *lack of access*

*to additional capital* and *other operating issues.* Additionally, these ratings actions consider

*Regis' continued poor operating performance.*" [6] Regis Ins. Co., 2013 WL 775521, at *7.

As previously discussed, Ms. Rinaldo and Ms. Standen only testified to damages

allegedly resulting from the ratings downgrade.  Neither, however, testified to any harm

allegedly resulting from the language of the press release.  Neither Mr. Johnson nor Mr.

Helstrom provided any testimony regarding the press release, but instead offered only their

---

[6] At trial, Regis seemed to focus on only two of these statements: "the *recent* disclosure of lack of financial
flexibility" at Tiber, and "lack of access to additional capital."  Regis' introduction of Exhibit 41 challenges the
"recent disclosure" language.  With respect to "lack of access to additional capital," Regis did not argue or present
evidence that this statement was false.  Rather, the questions Regis directed toward its witnesses appeared aimed at
asserting that Regis would not *need* access additional capital.

opinions regarding the rating itself.  Further, because Mr. Cohen had not offered any opinions on

the press release itself in his expert report, the Court did not permit him to belatedly do so at

trial. (Trial Tr. 56:16-59:16, May 28, 2013.) This evidentiary ruling has not been challenged by

Regis.

      **The only witnesses who substantively testified regarding the press release were Mr.**

**Liebowitz and Mr. Altonji.**  When Mr. Liebowtiz was questioned about the aforementioned

statements in the 2010 press release, he expressed his opinion that Best's target audience consists

of sophisticated insurance brokers who subscribe to Best's service.  As subscribers, Mr.

Liebowitz stated that Best's audience receives detailed information regarding ratings in Best's

"Green Book," on a CD-ROM, and through access to Best's website. (See Trial Tr. 136:9-

156:20, May 22, 2013.)  Although it is somewhat unclear, the substance of Mr. Liebowitz's

testimony was that to the extent statements in the press release are unclear, other resources

available to Best's subscribers would serve to clarify the statements in the press release.  Mr.

Altonji was not questioned about specific statements in the 2010 press release, but as previously

discussed, see section III.B.6, supra, he was questioned regarding certain edits that were made to

the language of the internal draft press release (Exhibit 41).[7]  In so questioning Mr. Altonji,

Regis sought to draw a distinction between how information was conveyed in the internal draft

press release and how it was conveyed in the final version.  Regis now argues:

> **Certainly, Your Honor, if A.M. Best had included [the**
> **language of Exhibit 41], we could not have been here because**
> **they would have done exactly what Your Honor suggested they**
> **did not do.**  They would have accurately communicated to the
> reader the basis for the statement that the decision was predicated
> on the recent problems that arose at A.M. Best.  **But for reasons**

---

[7] The document now known as Exhibit 41 was not before the Court at the summary judgment stage.

> **that were never explained by anybody from A.M. Best, that**
> **sentence was extracted for no apparent substantive reason.**
>
> Instead of telling the whole story, A.M. Best chose to modify the
> story in a way [that] had we been offered the opportunity [to get to
> the jury] we would have argued proves reckless disregard for the
> truth.

(Tr. Oral Argument 6:2-15) (emphasis added).  The Court agrees with Regis that the language of

Exhibit 41 is a more accurate representation of Regis' situation than the information conveyed in

the final 2010 press release. See Regis Ins. Co., 2013 WL 775521, at*7 ("Best's [final] press

release is barely more than a page and neglects to mention—let alone disclose—the details of

how Best arrived at such a substantial downgrade. That is to say, Best's press release is almost

entirely devoid of context. When all the facts are disclosed, an opinion cannot be defamatory

because the listener is able to evaluate the facts for himself and is free to disregard the

conclusion the speaker made from these facts…But when an opinion discloses only *some* of the

facts on which it based, it is capable of defamatory meaning and therefore actionable.") (internal

citations omitted); (see also April 19, 2013 Order at 3) ("To be clear: the problem with the [final]

press release is that it arguably implies Regis experienced certain financial difficulties in 2009

when, in fact, it had not.  The only thing that had changed in 2009 was that Best learned of

information about the financial health of Regis' parent company of which it was previously

unaware.")  The problem, however, is that Exhibit 41 *at most* only proves that A.M. Best could

have used better, more accurate language. **But the mere availability of better language,**

**without more, would have been insufficient for a jury to find that the language actually**

**used rises to the level of falsity or reckless disregard for the truth**.[8] (See Tr. Rule 50(a) Mot.

---

[8] The Court remains unconvinced by Best's argument that the press release was not intended to be a complete
reflection of Regis' circumstances.  See e.g. Trial Tr. May 28, 2013, 138:22-139:5 ("The important point to

Ruling 2:15-20, May 28, 2013) ("As it relates to the press release, the Court is of the same opinion that while the statements may have been changed, the substance of the press release was the same, and the change was not so material that it entered into the area of actual malice.)

Because Regis devoted so much time at trial to "challenging" the mere fact of the ratings downgrade, comparatively little time or testimony was devoted to exploring the press release. Mr. Liebowitz could not recall whether he or Mr. Altonji wrote the relevant language of Exhibit 41.  Mr. Altonji testified it was Mr. Liebowitz who wrote the language of Exhibit 41.  *Both* Mr. Liebowitz and Mr. Altonji testified that the language of the 2010 press release was the result of final edits made by Mr. Mosher.  The obvious conclusion is that Mr. Mosher was the best person to testify as to why the language of the press release was changed. Regis did not call Mr. Mosher, however, despite the fact that Mr. Mosher was identified as a witness in Regis' pretrial memorandum. (See ECF No. 61 at 10.) Thus, to the extent that it was "never explained by anybody from A.M. Best" why the edits were made, this is largely because Regis failed to ask certain questions of Mr. Liebowitz and Mr. Altonji and elected not to call Mr. Mosher to testify. Thus, based on the testimony that *was* presented at trial, there was no evidence that the statements in the press release were false or defamatory.

---

remember about the press release is that the press release was not intended to be a report. And there has been no evidence presented by the Plaintiff that this press release was supposed to be a full report regarding Regis.  And no one has disputed on the Plaintiff's side that the press release is an announcement of the rating action and a very short summary of the reasons for the rating action.");  see also Tr. 14:1-12 ("The press release most importantly is to announce the rating event itself. Secondly, it is to explain in some summary manner the basis for that rating decision.  It is not designed or intended to include arguments on both sides as to why the credit rating agency, such as A.M. Best, decided to rate the company in one way and the rated company's argument as to why it should have been rated differently.  And yet that is exactly the type information that Regis is now arguing should have been included in the press release.")) The fact that a press release, by its nature, is not intended to be exhaustive does not relieve A.M. Best from the responsibility of conveying information accurately.  That said, however, the fact remains that there is no evidence that the language actually used rises to the level of falsity or regardless disregard for the truth.

Additionally, the Court also found salient Mr. Liebowitz's uncontroverted testimony that, on December 17, 2009, he sent a copy of the draft press release to Mr. DiLoreto and Mr. Helstrom (Trial Tr. 7:13-9:17, May 23, 2013; Def.'s Trial Ex. 52.) Sending draft versions of press releases to the rated entity is the standard practice of A.M. Best. However, neither Mr. DiLoreto nor Mr. Helstrom opted to comment on the language of the draft, or to propose changes to its language.  Likewise, on January 6, 2010 following the Corporate Rating Committee meeting, Mr. Liebowitz also sent Mr. DiLoretro a revised draft press release.  Again, Mr. Liebowtiz received no comments or proposed changes from Mr. DiLoreto, Mr. Helstrom, or anyone else at Regis. (Trial Tr. 11:3-12:4, May 23, 2013; Def.'s Trial Ex. 58.)  The fact that A.M. Best gave Regis two opportunities to propose changes to the press release again undermines any assertion that Best acted with reckless disregard for the truth.

Finally, Regis also presented no evidence at trial that any current or prospective client read the press release, and opted not to renew or purchase insurance with Regis due to its contents.  Again, Regis only offered evidence of alleged harm due to the rating itself.  As such, Regis' defamation and commercial disparagement claims must also fail because there was no evidence that anyone read the allegedly defamatory statement, and reputational harm resulted. 42 Pa.C.S. § 8343(a)(4) & (5).

Accordingly, based on the foregoing, the Court's Rule 50(a) ruling with respect to the press release was neither inconsistent with its March 1, 2013 Memorandum Opinion and April 19, 2013 Order, nor impermissible fact-finding.

## IV. <u>CONCLUSION</u>

For the reasons set forth above, Regis' Motion for New Trial is denied.  An appropriate order follows.